Paula JOHNSON, Appellant and
Cross-Appellee,

v.

STATE of Alaska, and City of Fairbanks,
a municipal corporation, Appellees
and Cross-Appellants.

Nos. 4866, 4871 and 4894.

Supreme Court of Alaska.

Nov. 13, 1981.

 

 

James A. Parrish, Fairbanks, and Theodore R. Dunn, Dunn, Baily & Mason, Anchorage, for appellant and cross-appellee.

Dennis M. Bump and Doris R. Ehrens, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellee and cross-appellant City of Fairbanks.

Clifford W. Holst, Ely, Guess & Rudd, Anchorage, for appellee and cross-appellant State of Alaska.

Before RABINOWITZ, C. J., CONNOR, and BURKE, JJ., COATS, Court of Appeals Judge, and SCHULZ, Superior Court Judge.*

## OPINION

CONNOR, Justice.

This tort case arises from a 1974 bicycle accident that severely injured appellant, Paula Johnson.[1] When her accident occurred, Johnson was riding her new ten-speed bicycle along Phillips Field Road in Fairbanks. At trial Johnson had no recollection of how her accident occurred. An eyewitness to the accident testified that Johnson was traveling west as she approached the railroad tracks at the Fairbanks Municipal Utilities System (hereafter "MUS") spur track crossing, and that as Johnson reached the tracks, the front wheel of her bicycle caught, pitching her over the front of her bicycle. The incident occurred rapidly and Johnson did not break her fall.

Following her accident Johnson brought an action against the State of Alaska (hereafter "state") and the City of Fairbanks (hereafter "city") seeking damages for her injuries. She alleged that the state and city were negligent in the design, maintenance and "signing" of the railroad crossing which caused her accident.

The railroad track in question crosses the road at a severe angle, making travel by bicycle both difficult and hazardous. The crossing is a spur track, used by the MUS to transport coal to its power plant. The crossing is owned and maintained by the city.[2] The tracks cross Phillips Field Road, part of the state highway system.[3] The state admits having a duty to maintain the road. The state also admits having a joint duty with the city to provide warning signs to users of the road. The city admits sharing a joint duty with the state regarding maintenance and signing in the area immediately adjacent to the MUS crossing.

At the time of Johnson's accident two sets of warning signs existed at the crossing. Standard wooden crossbuck signs were placed there by the United States

---

* Coats, Court of Appeals Judge, and Schulz, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

1. The case was before this court previously. In *Johnson v. City of Fairbanks*, 583 P.2d 181 (Alaska 1978), we invalidated the provision of the Fairbanks City Charter which precluded a party from bringing an action against the city if notice of the claim was not filed within 120 days of the injury.

2. The *land* on which the MUS spur track crossing and the MUS coal shaker sit is owned by the Alaska Railroad and *leased* to the City of Fairbanks. The spur track crossing and coal shaker were constructed as part of a Department of Public Works project. Construction was completed in 1958. The spur track *crossing* was then *purchased* by the City of Fairbanks in 1958, and the city took over maintenance duties. Since 1958, the city has participated in and been responsible for the maintenance and signing of that portion of Phillips Field Road in the immediate vicinity of the spur track crossing.

 In 1970, at the request of the Alaska Railroad, the city reconstructed the spur track crossing, including its subsurface ties and rails.

Reconstruction was done pursuant to specifications approved by the state. The project included the replacement of approximately 200 feet of spur track, as well as asphalting both the crossing between the running rails and approximately 100 feet of Phillips Field Road on each side of the rails.

The spur track consists of running rails and mud rails. Mud rails are sections of rail that have been turned sideways and butted on the inside of each running rail; this creates an enclosed flangeway groove. This flangeway gives the flange of the railroad wheel a path to travel without obstruction. The mud rail, with its enclosed flangeway groove, is required on public crossings; without it, railroad cars might climb the rails and derail.

3. Phillips Field Road was originally a dirt and gravel road, owned by the Alaska Railroad, which ran through the railroad reserve. In 1958, the Railroad granted the United States Bureau of Public Roads an easement interest to reconstruct and pave the road. Pursuant to that agreement the road was paved in 1959. In 1961, the United States deeded its easement interest in Phillips Field Road to the State of Alaska. Since that date, the road has been part of the state highway system.

government when the road was paved in the late 1950's. As part of its 1970 reconstruction of the spur track crossing, the city placed standard advance railroad warning signs (round, black on yellow) at the crossing. At the time of Johnson's accident, no warning signs were posted which specifically warned bicyclists of any potential danger in riding across the spur track. Phillips Field Road was not designated a bicycle route and had no special bicycle facilities such as bicycle paths.

At the close of Johnson's evidence the trial court directed a verdict in favor of the state, concluding that the state had no duty to Johnson absent notice of the hazard which the railroad crossing presented to bicyclists. The claims against the city went to the jury, which subsequently returned a special verdict finding the city not negligent. Johnson appealed, and both the state and city filed cross-appeals.

On appeal, Johnson raises as error: (a) the exclusion of certain evidence; (b) the granting of a directed verdict in favor of the state; (c) the failure to grant Johnson a directed verdict on the issue of her comparative negligence; (d) the failure to give requested instructions on (i) the statutory duties of a utility permit holder, and (ii) a bicyclist's obligations under the Alaska Administrative Code; and (e) the giving of improper instructions on (i) notice, (ii) whether a railroad track and standard warning sign is evidence of a warning of danger, and (iii) proximate cause.

On cross-appeal, the state argues that the trial court erred in denying its motion for summary judgment. The state had argued (a) that certain allegations of negligence were barred by the discretionary function immunity contained in the Alaska Torts Claims Act, AS 09.50.250; and (b) that there was no evidence establishing that a maintenance defect was a substantial factor in causing Johnson's accident and, therefore, that the state was entitled to judgment on the negligent maintenance claim as a matter of law.

Finally, on its cross-appeal, the city argues that the trial court erred in excluding certain photographic evidence.

We conclude that the trial court did err in directing a verdict in favor of the state and in instructing the jury about the role of notice in a negligence action for a dangerous road condition. The case must, therefore, be remanded.

## JOHNSON'S APPEAL

### I. Directed Verdict in Favor of the State

The standard for reviewing a motion for a directed verdict is:

> "not to weigh conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment." (footnote omitted).

*Rutherford v. State*, 605 P.2d 16, 18 (Alaska 1979). *See Beaumaster v. Crandall*, 576 P.2d 988, 994 (Alaska 1978). If, in viewing the evidence in a light most favorable to Johnson, a verdict might have come back in her favor against the state, then the court erred in directing a verdict for the state. *Mallonee v. Finch*, 413 P.2d 159, 160 (Alaska 1966). Thus the state was entitled to a directed verdict only if it can be said that fair-minded jurors, in the exercise of reasonable judgment, could reach but one conclusion, *i. e.*, that the state was not negligent in the design, maintenance, or signing of the roadway where the spur track crosses it. *See Bachner v. Rich*, 554 P.2d 430, 436 (Alaska 1976). Applying these principles and the negligence standard of due care to the facts of this case leads to the conclusion that the trial court erred in directing a verdict for the state.

The trial court based its decision on the fact that the state had no notice of the dangerous condition presented to bicyclists by the railway crossing. The court reasoned that the state does not have a duty to guard against all risks, and to the extent

that there is a duty, it does not arise until there is notice of the defect.[4]

■■■ The trial court misconstrued the role of notice in a negligence action against the state for a defective road condition. Johnson's evidence was to be measured against the substantive negligence standard of due care. The duty of care owed by the state to users of its highways is defined by ordinary negligence principles. *State v. Guinn*, 555 P.2d 530, 535 (Alaska 1976); *State v. I'Anson*, 529 P.2d 188, 195 (Alaska 1974); *State v. Abbott*, 498 P.2d 712, 724–25 (Alaska 1972). That duty requires one to act with the amount of care which a reasonably prudent person would use under the same or similar circumstances. *Leigh v. Lundquist*, 540 P.2d 492, 494 (Alaska 1975).[5] Notice is relevant, and necessary, when the dangerous condition is not caused by the state. In such a case, the plaintiff must establish either actual or constructive notice. Constructive notice can result if a dangerous condition exists for such a period of time prior to the accident, and is of such an obvious nature, that the defendant public entity, in the exercise of due care, should have discovered the condition and its dangerous character. *See Atlanta v. Williams*, 119 Ga.App. 353, 166 S.E.2d 896, 897 (1969); *Galbreath v. Logansport*, 151 Ind.App. 291, 279 N.E.2d 578, 581 (1972); *Peters v. State*, 400 Mich. 50, 252 N.W.2d 799, 804 (1977); *James v. Nashville & Davidson County*, 55 Tenn.App. 622, 404 S.W.2d 249, 252 (1966). *Cf. Livings v. City of Chicago*, 26 Ill.App.3d 850, 326 N.E.2d 170, 174 (1975) (continued

existence of a defect is sufficient to *charge* the government with notice); *Freeport Transport v. Commonwealth*, 408 S.W.2d 193, 195 (Ky.App.1966) (same). Notice is also a permissible inference that the jury may draw where there is evidence of prior accidents caused by the asserted dangerous condition. *See Burgbacher v. Mellor*, 112 Ariz. 481, 543 P.2d 1110, 1112 (1975); *Atlanta v. Williams*, 119 Ga.App. 353, 166 S.E.2d 896, 897 (1969); *City of Chicago v. Jarvis*, 226 Ill. 614, 80 N.E. 1079, 1080 (1907).

■■ When the public entity itself causes the defect, however, notice is not required. *Wisener v. State*, 123 Ariz. 148, 598 P.2d 511, 513 (1979); *Aguirre v. City of Los Angeles*, 46 Cal.2d 841, 299 P.2d 862, 864 (1956); *Muszynski v. City of Buffalo*, 305 N.Y.S.2d 163, 33 A.D.2d 648 (App.Div.1969), *aff'd*, 29 N.Y.2d 810, 327 N.Y.S.2d 368, 277 N.E.2d 414 (1971); *Gordon v. Provo City*, 15 Utah 2d 287, 391 P.2d 430, 432–33 (1964). The rule has been well stated as follows in its application to municipalities. Because the standard of care required of the state in keeping its highways safe is the same as that required of a municipality, *Wisener*, 598 P.2d at 513, the following rule regarding notice applies equally to the state:

> "In seeking a recovery against a city for injuries due to an allegedly defective public way, it is only where the negligence relied on is the failure of the city to remove an obstruction or to repair a defect in the street, not caused by its own act or neglect, that the question of notice of obstruction or defect is an essential

---

4. The trial court stated:
 "Nobody notified the State and I think that stands as undisputed evidence in the case. So, the notice to the State, if there's going to be notice there, it has to be or should have known. The mere fact that a condition exists out there does not create a hazard—or notice that it's hazardous.... I don't know whether there's been proof of a defect or not.

 . . . . .

 I don't think there's anything to trigger anything or any action on the part of the State or any duty on the part of the State, other than the one they have, to maintain—to build that crossing so it's reasonably safe for anybody that could be anticipated to use this. This is a railroad industrial area. It was not de-

signed for bicycles. I think everybody would admit that."

5. Paraphrasing *State v. Abbott*, 498 P.2d 712, 725 (Alaska 1972), the factors to be considered in a negligence action against the state for a dangerous highway condition not caused by it would be (a) whether the state had notice of the dangerous condition, (b) the length of time the dangerous condition existed, (c) the availability of employees and equipment to remedy the situation, (d) the amount of traffic on the highway. In addition, the traditional proximate cause foreseeability limitations apply, as do the other elements of a negligence cause of action. *Id.*

element. *If the defective condition is due to the act of the municipality itself,* or its act or negligence in connection with the acts of others, *or to the acts of others as its contractors or employees, no notice of any kind,* either actual or *constructive, is necessary. This rule extends to municipal negligence in the original construction of the offending public way and applies to affirmative municipal negligence in maintaining a nuisance.* No notice of any kind is required in the aforementioned instances . . . ." (emphasis added, footnotes omitted).

19 E. McQuillin, The Law of Municipal Corporations § 54.104 (3d ed. 1967).

█ Johnson claimed that the state was negligent in three ways: (a) in the design of the roadway where the spur track crosses it; (b) in the signing of the roadway; and (c) in the maintenance of the roadway. Under the rule just stated, proof of notice was not required for Johnson to prevail on her claims of unsafe design or failure to sign, because any dangerousness resulting from such acts devolves from the state's own conduct or omission.[6] Thus the court erred in directing, because of the absence of notice, a verdict against Johnson on these claims. On retrial Johnson must still convince the jury that there was in fact a dangerous condition.

The court also erred in directing a verdict for the state on Johnson's claim of negligent maintenance. Taking the evidence most favorably to Johnson, as we must when reviewing a directed verdict, we conclude that a jury question was presented as to whether there was a maintenance defect and whether the state had constructive notice of that defect.

Kenneth Ulz, a civil engineer, testified that the asphalt of the roadway should butt up against the outer rail or railroad crossings. Keeping the asphalt flush with the outer rail, he stated, is a maintenance function. As a former engineer for both the City of Fairbanks and the state Department of Transportation, he testified that the city

maintains Phillips Field Road. In addition, however, the state admitted a duty to maintain the road. Johnson introduced several pictures to show that the asphalt at the MUS crossing failed to comply with the standards Ulz specified.

Numerous accidents similar to Johnson's occurred at the spur track crossing. Eleven witnesses testified to falling sometime prior to Johnson's accident while riding a bicycle across the same spur crossing. These accidents occurred while traveling in both directions on the road, under both rainy and dry conditions, and while riding a variety of bicycle models. One accident witness was a regional geologist with the state Department of Transportation. His job duties, however, were limited to investigating the foundations of existing or proposed highway routes, rather than involving issues of surface safety, and he never reported his accident to anyone. One witness did report her accident, but not to the state. Ms. Rose Lee Bezdek testified that after her fall in 1971 at the spur crossing, she telephoned both the Railroad and the Fairbanks city manager to inform them of the hazard. Finally, a municipal worker employed at the utility plant adjacent to the spur track crossing testified that he and other utility workers were aware of bicycle accidents occurring at the crossing, but he admitted that he did not perceive bicycle accidents on the road to be within the MUS's safety program requiring that accidents be reported, and thus never did report any of the accidents.

In addition to the fact of prior accidents, Johnson put on expert evidence establishing that the severely angled crossing presented a hazard to bicyclists. Gary Rice, an engineer in the Fairbanks city engineer's office from 1972 to 1977 (Johnson's accident occurred in 1974), testified that the angle at which the MUS railroad crossing intersects Phillips Field Road presents a potential hazard to bicycle traffic. He testified that bicycle tires can be deflected and caught by the flangeway of the railroad track. One

6. As discussed more fully in connection with the state's claim of immunity, the state ap-

proved the design of the crossing prior to its 1970 reconstruction. See text at note 37, *infra.*

way to reduce the hazard, he stated, is to post warning signs for bicyclists. A videotape prepared by Rice showed that at a similarly angled crossing in Fort Wainwright, where a "bicyclists dismount" warning sign is erected, the sign was effective in calling the bicyclists' attention to the potential hazard. The majority of these riders either stopped pedaling, slowed down, or attempted to cross the tracks at a more perpendicular angle.

Rice further testified that an additional method of decreasing the risk of bicycle accidents at the crossing would be to allow bicyclists to cross the tracks at as close to a perpendicular angle as possible. One way to do this would be to construct a pad off to the side of the road, allowing bicyclists to angle into the crossing. He testified, however, that the lease between the Alaska Railroad and the city for the crossing's underlying land requires a seven-foot clearance, and in his view this limitation precluded installing such a pad. But other testimony established that it is possible to obtain permission from the Railroad to modify the clearance requirement.

Rice also testified that at the time of Johnson's accident, no portion of Phillips Field Road was dedicated as a bikeway or bike route, although he acknowledged that bicyclists have a right to use the road. Further, he was unaware, in 1974, of any engineering criteria calling for special consideration of bicycle travel over railroad crossings.

Johnson's evidence also showed that the MUS crossing was one of the three most severely angled crossings in the Fairbanks area. Ken Collette, another civil engineer, testified that of approximately sixty-one railroad crossings in the Fairbanks area, only two intersect roads at an angle as

great as that of the spur track crossing on Phillips Field Road. The MUS spur track crossing intersects the road at a skew angle [7] of 76 degrees. The other two similarly-angled crossings (one 78 degrees the other 75 degrees) [8] are located on Fort Wainwright.[9] One of these crosses a gravel road and is therefore unlikely to be used by bicyclists; the other has had a "bicyclists dismount" warning sign for some time. No such sign was posted at the MUS spur crossing until after Johnson's accident.

Finally, Ronald Tanner, the regional traffic and safety engineer for the state Department of Transportation, was called by Johnson as an adverse witness. He testified that the duty to erect adequate warning signs on Phillips Field Road is a joint obligation of the city and state. His responsibilities as regional engineer include responding to safety problems arising on the state highways within his region. These responsibilities extend to the approximately thirty-five railroad crossings maintained by the state in that region.

Tanner testified that at no time prior to Johnson's accident was he aware that the MUS spur track crossing presented a potentially hazardous condition to bicyclists. He testified that he relies on a variety of information sources in identifying potential safety problems, including routine personal inspections of roads, review of police accident reports, computer printouts from his agency's headquarters in Juneau that list accidents, citizen complaints, both directly to the state and relayed by the city, newspaper articles, reports from regional maintenance personnel, and federal and state highway manuals which illustrate potentially dangerous conditions. He testified that none of these sources alerted him to the danger involved in this case.

7. A skew angle is measured from perpendicular to center line. Thus a crossing with a skew angle of 0 degrees is perpendicular to the roadway, i. e., it is at a right angle. A skew angle of 90 degrees means that the track runs parallel to the road.

8. After these three crossings, the next most severely angled crossing is 64 degrees.

9. Comparing the MUS spur track to these two crossings is somewhat troubling because it is possible that the military has different standards regarding user safety. However, no objection was made when the trial court admitted evidence concerning these crossings, and because we are not convinced that such admission rises to the level of plain error, we will not consider the comparison error on appeal.

According to Tanner, at the time of Johnson's accident, a crossbuck sign and an advance railroad crossing sign were in place at the MUS spur track crossing. These signs complied with the 1974 safety manuals mentioned above, and he considered the signing adequate. Tanner admitted, however, that he was not limited to these manuals in considering possible hazards.[10]

Reasonable persons could differ as to whether there was a maintenance defect and whether there was constructive notice[11] to the state of the need for repair. These were issues for the jury to resolve. Further, no proof of notice was required as to Johnson's claims of negligence which were based on the state's own act or omission,[12] *i. e.,* negligent design or failure to sign. The trial court erred in interpreting the role of notice as to Johnson's claim and in subsequently directing a verdict for the state premised on a lack of notice. The case must be reversed and remanded for a trial against the state.

## II. Jury Instruction Concerning Notice to the City of Fairbanks

### A. The Role of Notice

■ Johnson contends that the trial court also erred on the notice issue in its instructions to the jury concerning the city's liability. The court instructed the jury as follows:

"No. 18. *Plaintiff must show that the City of Fairbanks had notice of the dangerous condition in order to establish liability.* Such notice may either be actual or constructive. Constructive notice may be shown by showing that the danger or defective condition had existed for such a period of time that the City in the exercise of ordinary care and diligence should have known of its existence.

No. 19. *A municipality receives actual notice of a defect or dangerous condition in a public street or area only through knowledge gained by its officers and employees who are in charge of the streets or area or the maintenance thereof,* or whose duty it is to report such matter to an officer or employee with such authority.

*The notice must be through some officer or agent of the city whose duty and authority, in some way, relate to the care of its streets. However, notice to a municipal officer whose duties in no way relate to the care of streets or area is not notice to the municipality.*

No. 20. A public entity may also receive legally binding constructive notice of a dangerous condition of its streets and public ways if:

1. It is of such a nature that the authorities, by the exercise of ordinary care, should have discovered or appreciated its potential danger to persons acting as plaintiff was acting at the time of her accident; *and*

2. The condition had existed for such a period of time that the authorities, by the exercise of ordinary care, should reasonably have known of its existence; *and*

3. That through the exercise of ordinary care the authorities could have guarded against the danger, which includes warning of danger if warning would constitute reasonably adequate protection." (emphasis added).

---

**10.** The only hazard these manuals pointed out regarding railroad crossings was the effect of a crossing's angle on the line of sight, *i. e.,* its effect on the driver's ability to see an approaching train.

**11.** We reject Johnson's claim that notice of the hazard is imputable to the state. In support of imputed notice, Johnson points out that the city's manager was told of the hazard and cites *Peters v. State,* 252 N.W.2d 799 (Mich.1977), for the proposition that this notice is imputable to the state. We disagree. In that case the court held that notice of a road condition given to a county road commission was imputed to the state where the commission was contractually obligated to maintain the highway for the state. *Id.,* at 803–04. There is, however, no contractual relation between the city and the state in this case, nor did Johnson establish any principal-agent relation that would allow notice to be imputed.

**12.** The state did not contest that it is held to have notice of the existence of its roads. Further, it admitted approving the design specifications for the roadway and crossing.

Johnson claims Instruction No. 18 erroneously established an absolute requirement of notice and, further, that the three instructions were misleading and argumentative.[13]

The same rule we have adopted with respect to notice vis-a-vis the state applies here. Thus, the instruction is erroneous because it fails to advise the jury that notice is not necessary when the asserted dangerous condition is caused by the city.[14] Johnson's claim of negligence against the city is premised upon the city's own act in reconstructing the spur track crossing in 1970, and thus the jury should have been free to conclude that notice was not necessary.

Although the instruction as given was erroneous, in order to show that the error was not harmless Johnson must demonstrate a likelihood of prejudice. *See Meyst v. East Fifth Avenue Service, Inc.*, 401 P.2d 430, 437 (Alaska 1965). We believe that the instruction was misleading and was prejudicial "because we cannot say that the jury's verdict may not have been different had it not been so instructed." *Howarth v. Pfeifer*, 423 P.2d 680, 684 (Alaska 1967); *e. g., Evans v. Buchner*, 386 P.2d 836, 838 (Alaska 1963). Accordingly, the jury verdict in favor of the city is vacated and the case must be remanded for a new trial against the city.

### B. Notice to the City Manager

Johnson also contends that the trial court erred in failing to modify the notice instructions to provide that "the City Manager's duty relates to care of the streets and the MUS coal spur crossing." Johnson sought the instruction in order to bolster her claim, in light of the previously quoted Instruction No. 19, that the city had actual notice of the dangerous condition. In support of her request Johnson relied on evidence of a call by a similar accident witness to the city manager about the crossing,[15] and on provisions of the Fairbanks City Charter[16] and the Fairbanks Code of Ordinances[17] which describe certain duties of the city manager.

**13.** We reject Johnson's argument that the instructions were argumentative and lengthy. The cost of greater brevity might well have been a loss of clarity. In addition, Instruction No. 2 cautioned the jury not to interpret repeated instructions as placing emphasis on any issue.

**14.** The following jury instructions would have correctly represented the relevant rule regarding notice:

Plaintiff's cause of action against defendant _____ is based upon and must meet the requirements of the law relating to the liability of a public entity for a dangerous condition of public property.

Before the plaintiff may be entitled to your verdict under this law [against defendant _____], you must find from a preponderance of the evidence:

First: That _____ was in a dangerous condition on _____;

Second: That the injury of which plaintiff complains was proximately caused by the dangerous condition;

Third: That the injury occurred in a way which was reasonably foreseeable as a consequence of the dangerous condition of the property; and

Fourth: That either:

(a) *The dangerous condition was created by a negligent or wrongful act or omission of an employee of the _____, acting within the scope of his employment, or*

(b) The _____ had actual or constructive notice of the dangerous condition for a sufficient time prior to the time of the accident so that the measures could have been taken to protect against the dangerous condition.

**15.** One witness who suffered a similar accident prior to Johnson's testified that she called the city manager and informed him of the hazard at the spur track crossing. The city manager, however, testified that he had no recollection of the call.

**16.** The Home Rule Charter of the City of Fairbanks provides, in part:

"Article IV. City Manager, City Attorney, City Clerk and Administrative Departments *Sec. 4.1. The city manager.*

The council shall appoint a city manager who shall be head of the administrative branch of the city government. The city manager shall serve at the pleasure of the council and shall be responsible to the council for the administration of all affairs of the city."

**17.** Fairbanks Gen. Code Ord. § 2.605(a):

"The council, the city manager, or any person or committee authorized by either of them, shall have power to inquire into the conduct of any council member, the mayor, any office, department, agency or officer of the city and to make investigations as to

We reach this issue for the limited purpose of guiding the trial court on remand.

■ The underlying issue is whether notice to the city manager of a dangerous road condition is notice to the city. The city argues that notice to the city manager is *not* notice to the city because the maintenance of the spur crossings is entirely unconnected to the manager's duties. Notice, it argues, must go to some official having authority to remedy the situation.[18] The appropriate rule is that notice to the city's chief executive officer of the crossing's dangerousness is notice to the city.[19] To adopt the city's position would make the effectiveness of notice entirely dependent upon whether a complaining citizen is astute or fortunate enough to select *the* particular city employee with direct responsibility to correct the condition. The city manager is charged with the power to inquire into the conduct or activities of any department,[20] and thus notice to the city manager should be sufficient.[21]

### III. Other Claimed Errors

Since our disposition of the above issues requires reversal, we address Johnson's remaining claims of error only to the extent necessary to guide the proceedings upon remand.

### A. Exclusion of Certain Testimonial Evidence

Although the trial court admitted the testimony of witnesses who had accidents similar and *prior* to Johnson's accident, it excluded the testimony of three additional witnesses whose similar accidents occurred *after* hers. Johnson argues that this evidence of subsequent accidents was admissible toward both the issues of dangerousness of the crossing and causation, and, therefore, that its exclusion was erroneous.

■ Johnson is correct that evidence of both prior and subsequent occurrences is admissible, so long as the conditions are similar.[22] Such evidence can help prove a defective or dangerous condition, causation, or, if prior in time, notice. Even relevant evidence, however, may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the

---

municipal affairs and for that purpose may order the appearance of witnesses, administer oaths, and compel the production of books, papers and other evidence. . . ."

18. The city relies on the following language from *Morris v. City of Deer Lodge*, 140 Mont. 157, 369 P.2d 30, 32 (1962):

"It is elementary that notice to an officer or employee of a municipal corporation, who has no authority to cause repairs to be made and who is not chargeable with the responsibility of ascertaining and reporting defects to those having authority to repair, is not notice to the municipal corporation."

19. *Commissioner of Corp. & Tax. v. City of Malden*, 321 Mass. 46, 71 N.E.2d 601, 603 (1947):

"The mayor is the chief executive officer of the city . . . . A notice to him concerning a matter in which the city has a pecuniary or proprietary interest, or a right to protect or enforce, is generally regarded in the absence of a statute to the contrary, to be sufficient notice to the city." (citations omitted).
Here the city has a cognizable interest in that it owns the MUS spur track crossing and is a lessee of the underlying land, and has a duty to its users.

20. *See* notes 16 & 17, *supra*.

21. This result can most easily be obtained by replacing Instruction No. 19 with the following:
"PUBLIC ENTITY—ACTUAL NOTICE OF DANGEROUS CONDITION
A public entity had actual notice of a dangerous condition if an officer or employee of the entity, while acting within the course and scope of his authority, had notice or actual knowledge of the existence of the condition and knew or should have known of its dangerous character, which notice or knowledge the officer or employee, in good faith and in the exercise of ordinary care and diligence in the discharge of his duty, ought to have communicated to the entity."

22. *Kanelos v. Kettler*, 406 F.2d 951, 956 n.30 (D.C.Cir.1968); *Henwood v. Chancey*, 156 F.2d 392, 397 (8th Cir.), *cert. denied*, 329 U.S. 760, 67 S.Ct. 113, 91 L.Ed. 655 (1946); *St. Louis S.W. Ry. Co. v. Jackson*, 242 Ark. 858, 416 S.W.2d 273, 276 (1967) (prior occurrences); *Gilbert v. Pessin Grocery Co.*, 132 Cal.App.2d 212, 282 P.2d 148, 154 (1955) (prior occurrences); C. McCormick, Law of Evidence § 200, at 473–78 (2d ed. 1972); J. Wigmore, Evidence § 458 (Chadbourn rev. ed. 1979).

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Alaska R.Evid. 403. It is unclear from the record whether the trial court excluded the evidence as irrelevant or, instead, under Evidence Rule 403. Even so, we cannot say that the trial court abused its discretion in excluding the evidence and thus do not find the exclusion to be reversible error.[23]

■ Johnson asserts that the trial court also erred in not allowing her to amend the witness list to include Edward Denbow, another similar accident witness, who came to her attention just two days before trial. The trial court's pretrial order required witness lists to be submitted well in advance of trial. Alaska Rule of Civil Procedure 16 provides that the pretrial order "shall control the subsequent course of the action unless modified by the judge to prevent manifest unjustice." Because Denbow's name was submitted after the pretrial order's deadline, Johnson had the burden to convince the court that manifest injustice would result should Denbow not be allowed to testify. Since there is no indication in the record that Denbow's testimony would go beyond that of the other witnesses, Johnson did not sustain her burden, and the pretrial order properly controlled. The record does not leave us with "the definite and firm conviction . . . that the judge . . . made a mistake in deciding as he did to exclude . . . a witness not listed in accordance with" the pretrial order. *Bertram v. Harris*, 423 P.2d 909, 917 (Alaska 1967).[24]

## B. Denial of Directed Verdict on Issue of Johnson's Comparative Negligence

■ Johnson asserts that the trial court erred in failing to grant a directed verdict on the issue of her possible negligence. In denying Johnson's motion, the trial court stated that:

"the jury could find she's gone across that track before, was aware of the existence of the rails, the placement of the track, and a person of ordinary prudence could assume that that track would deviate a tire from the direct course of travel. That's what happened. Whether she should be charged with some greater responsibility in crossing that track or not, I think is up to the jury."

Johnson argues that no evidence supported an inference of negligence on her part. She argues that unless she knew or should have known of the particular hazard posed by the sharp angle of the MUS crossing, she could not be negligent. Although no evidence established that Johnson was aware of the particular hazard that gave rise to her injury, we conclude that the trial court properly denied her motion.

Viewed in the light most favorable to the city,[25] the evidence established the following. It rained the day of Johnson's accident. At the time of the accident, it was "misting" and the pavement was wet and

---

**23.** We do not accept the city's argument that the evidence was properly excluded as being merely cumulative. Both cases the city cites in support of this position are distinguishable. In *Sloan v. Atlantic Richfield Co.*, 541 P.2d 717, 722 (Alaska 1975), *op. on reh.*, 546 P.2d 568 (Alaska 1976), exclusion was upheld on grounds that the witness had already testified on the subject and thus the subsequent testimony on the same point was merely cumulative. Here, however, the exclusion went to the testimony of *different* witnesses, each of whom may have presented varying circumstances, all tending to prove a dangerous condition. In *Palfy v. Hepp*, 448 P.2d 310, 311 (Alaska 1968), the excluded evidence was a written summary setting out amounts paid and amounts due in an action for rent. We held the summary to be cumulative because a record of payments and

receipts was already in evidence. Again, the proffered evidence in this case concerned different occurrences.

**24.** *See also Alaska Airlines, Inc. v. Sweat*, 568 P.2d 916 (Alaska 1977).

**25.** As stated previously, the test for reviewing rulings on directed verdicts is:

"not to weigh conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment." (footnote omitted).

*Rutherford v. State*, 605 P.2d 16, 18 (Alaska 1979).

slick. The rails were also wet. One witness testified that Johnson approached the track at a moderate speed; another indicated that she was traveling just fast enough to keep the bicycle upright and on balance. She was riding a ten-speed bicycle with regular tires, on the asphalt, on the right side of the roadway. She was seated upright with her hands on the handlebars. As she crossed the track, her bike suddenly caught something, her front wheel turned to the right, and she went over the bike, striking the pavement head first.

Although she had owned the ten-speed bicycle involved for only two weeks, Johnson was an experienced bicyclist, having ridden since the age of six. She had taken previous long-distance bike trips, and had received an award from her 4-H club for a bicycling project, which included reading a bicycle safety pamphlet, leading younger children on bike trips, and teaching bicycle maintenance.

She had ridden Phillips Field Road some ten to twenty-five times before and was aware of the four railroad crossings on that road. She testified that when crossing railroad tracks she would customarily rise off her seat to soften the ride. She testified that due to her studies and experience she was aware that various conditions, such as cars, animals, holes, wet roads, gravel, glass, and ruts, can be hazardous to bicyclists. She knew that holes, ruts, or gravel were dangerous because they "could throw you." She testified that she never rode over manholes or drains because of the potential risk they presented to bicyclists. She was aware of the "grooved slot" in railroad tracks.

No evidence showed any awareness that railroad tracks could catch and deflect a bicycle's front wheel. She testified that she had never read anything that referred to railroad tracks as a potential hazard to bicyclists and that she was unaware that railroad tracks could throw her. Finally, she testified that in all her previous crossings of the tracks on Phillips Field Road, she never experienced any problem or difficulty.

Even so, we believe that reasonable minds could differ in their judgment of whether Johnson was negligent. She was in control of the bicycle and was actively operating it. Her conduct necessarily must be considered, and it is a factual question for the jury whether she should have known of the danger presented by the crossing.[26]

C. Failure to Incorporate Statutory or Regulatory Standards into Jury Instructions

1. Duties of Utility Permit Holder

Johnson argues that the trial court erred in not incorporating into the jury instructions the following statutory standards of care prescribed for the holders of utility permits:[27]

"An electric transmission, telephone or telegraph line, pole line, *railway*, ditch, sewer, water, heat or gas main, flume, or other structure which by law may be constructed, placed, or *maintained across or along a highway by a person or political subdivision may be maintained or constructed only in accordance with regulations prescribed by the department.* No utility project of this nature may be undertaken until it is authorized by a written permit issued by the department." (emphasis added).

AS 19.25.010.[28]

"The permitee *shall take all measures necessary* to provide for the continued

---

**26.** Johnson relies heavily on language from pre-comparative negligence cases. With the advent of comparative negligence, adopted by this court in *Kaatz v. State*, 540 P.2d 1037, 1049 (Alaska 1975), we are more inclined to let the jury resolve the question of a plaintiff's possible contributing negligence.

**27.** The city stipulated that it holds a utility permit for the MUS spur track crossing "pursuant to law."

**28.** AS 19.25.010 has been amended to read: "A utility facility may be constructed, placed, or maintained across, along, over, under or within a state right-of-way only in accordance with regulations prescribed by the de-

travel of the highway by the public *during* construction or *maintenance* of a facility authorized by a utility permit, *and shall* protect, barricade and *sign any* obstruction, excavation or *hazard* across or along the traveled way."

17 AAC 15.060(a). The trial court denied Johnson's request on the ground that the statute and regulation apply only if active construction work is taking place.

Johnson argues that the statute and regulation apply because the city was "maintaining" the railway crossing (the object of the permit). She relies on the statute's definition of maintenance:

" 'maintenance' means the preservation of each type of highway, roadside structure and facility as nearly as possible in its original condition as constructed, or as subsequently improved, and the operation of highway facilities and services to provide satisfactory and safe highways;"

AS 19.05.130(9).

The city, on the other hand, argues that the above definition implies that maintenance refers to some type of active work undertaken to preserve the facility. It argues that applying the statute to the facts of this case would create onerous burdens: "If . . . the mere existence of a constant, continuing condition is [to be within the term] maintenance, the City would, for ex-

ample, have to sign every manhole whether being used in active work or not."

The city urges us to look not at the statutory definition of maintenance, but rather to the department's regulations which more particularly define the term. Those regulations divide maintenance into "routine" or "major." [29] Each, it argues, implies actual work. Thus, under the city's view, the regulatory obligations of adequate signing would apply only when city crews perform actual work on the crossing.

We agree. The regulation specifies certain duties that a holder of a utility permit must undertake when performing actual work on the MUS spur track crossing. No active maintenance work was being performed on the crossing at the time of Johnson's accident and, therefore, the regulatory standard was not applicable. The trial court properly refused to incorporate it into the instructions. Further, we believe the regulation was sufficiently ambiguous such that a prudent person could not reasonably determine whether it applied to other than active maintenance work; accordingly, the trial court did not abuse its discretion in refusing to adopt the standard in a negligence per se instruction. *See McLinn v. Kodiak Electric Association, Inc.*, 546 P.2d 1305, 1314 (Alaska 1976).

Because the standard was inapplicable on the facts, we do not address whether it was

partment and if authorized by a written permit issued by the department."
(1977 amendments.) "Utility" includes railroads. AS 19.05.130.

**29.** 17 AAC 15.050, *Facility Maintenance*, provides in pertinent part:
"(a) A utility permit shall authorize routine maintenance of a single utility facility on a continuing basis which involves only a minor risk or delay to the traveling public and does not in any manner endanger or create a hazard to the highway user, the highway or appurtenances.
(b) Routine maintenance is any work required to replace an entire or portion of an existing facility with another of the same type, capacity and design at the same location, or replacement work of an emergency nature, or minor work required to provide facility service to a user.

(c) Major maintenance is the alteration of an existing facility with a replacement of different type, capacity or design, or replacement at a new location.
(d) Any routine maintenance which requires excavation in or across the highway, appurtenances or immediately adjacent thereto shall be subject to specific authorization to proceed to be issued by the district highway engineer.
(e) Major maintenance shall require that the utility secure a utility permit authorizing construction and placement of the facility improvements within highway rights-of-way.
(f) The permittee shall be responsible for keeping to a minimum operations which will obstruct the flow of traffic and use of the highway, and shall at all times expedite the passage of vehicles on emergency duty, and for providing protection in accordance with sec. 60 of this chapter."

specific enough to warrant a negligence per se instruction.[30]

## 2. Obligations of Bicyclists Under the Alaska Administrative Code

Johnson argues that the trial court erred both in not allowing Johnson's attorney to examine an MUS supervisory engineer, and in not instructing the jury, on the following requirements of 13 AAC 02.400:

"A person operating a bicycle upon a highway shall ride as near to the right side of the roadway as practicable, exercising due care when passing a standing vehicle or one proceeding in the same direction.

. . . . .

A person operating a bicycle on a highway shall give way to the right as far as practicable to a motor vehicle proceeding in the same direction when the driver of a motor vehicle gives an audible signal."

Although an automobile was approaching Johnson from behind when she fell, there was no evidence that the driver gave an audible signal. Thus the second paragraph of the instruction was not applicable to the facts. It was properly omitted. The court, however, ruled that *both* paragraphs were inapplicable. It viewed the entire regulation as pertaining solely to passing, and the city urges the same view on appeal.

■ The trial court did not err in not allowing Johnson to cross-examine the engineer on his knowledge and interpretation of highway regulations contained in the Alaska Administrative Code. The existence and interpretation of those regulations was a matter of law for the court, to be dealt with in the court's instructions to the jury, if at all. The engineer was not qualified to give a legal opinion on the regulation. C. McCormick, Law of Evidence § 12, at 28 & n.55, § 335, at 776 (2d ed. 1972).

■ We do conclude, however, that the trial court erred in refusing to instruct the jury on the requirements found in the first paragraph of 13 AAC 02.400. Because the regulatory requirements were relevant to the reasonableness of Johnson's conduct under the circumstances, the jury should have been made aware of them. *See* W. Prosser, Law of Torts § 36, at 201–02, 203–04 (4th ed. 1971). The evidence showed that one method of reducing the hazard posed to bicyclists by the angled crossing would be to construct a pad or pathway to the side of the road, thus allowing bicyclists to swing out and approach the tracks more perpendicularly.[31] The city attempted to refute the need for such a pad by bringing out, on cross-examination of the MUS engineer, the point that a bicyclist could accomplish the same maneuver by utilizing the entire lane, *i. e.*, by approaching the crossing from a leftside angle. In light of this testimony and the fact that cars were approaching Johnson from both the front and rear, plus the testimony of a state regional traffic engineer that "[t]here isn't much room for a bicycle and a car on the Phillips Field Road," the issue of Johnson's right to use the entire lane was raised and the jury should have been instructed on the obligations of a bicyclist using the road. On remand, the first paragraph of 13 AAC 02.400 should be incorporated into the jury instructions.

## D. Asserted Error in Giving Certain Jury Instructions

## 1. Railroad Track and Standard Warning Sign As Evidence of a Warning or Danger

■ Johnson argues that the trial court erred in giving the following instruction:[32]

"A railroad track and railroad warning signs may be considered by you as evi-

---

**30.** The test for whether a regulatory standard is sufficiently specific to provide the relevant standard of care is set out in *Northern Lights Motel, Inc. v. Sweaney*, 561 P.2d 1176, 1183 (Alaska 1977); *Bachner v. Rich*, 554 P.2d 430, 440–41 (Alaska 1976); and *Ferrell v. Baxter*, 484 P.2d 250, 263 (Alaska 1971).

**31.** The evidence was slightly contradictory as to whether the construction of such a pad or path was feasible under the clearance restrictions governing the area adjacent to the crossing. See discussion in text at page 11, *supra*.

**32.** The city argues that Johnson did not object to the instruction at trial and is thus precluded from raising it on appeal. The argument is

dence of a warning of danger. While a traveler is not always required to stop before crossing a track, a traveler is required to exercise care commensurate with the danger."

Instruction No. 36.

The instruction devolves from a line of cases involving collisions between trains and automobiles [33] and thus historically was designed to convey the concept that the track and signs constitute a warning of the danger of a collision. As such, Johnson argues, it was inappropriate, as well as argumentative and misleading.

Johnson points out that her main claim of negligence was that the city should have posted a sign alerting bicyclists to the particular hazard presented by the railway crossing's extreme angle. The hazard was that the tracks could "throw" a bicyclist. The main thrust of the city's defense was that the standard, general purpose signs in place were sufficient to warn all travelers of all hazards associated with the crossing. Thus, Johnson argues, to instruct the jury that the existing signs may be evidence of a warning of danger, and that a traveler is required to exercise care commensurate with that danger, was to effectively determine the outcome of the case against her.

We disagree. The instruction merely allowed the jury to consider whether the signs provided a general warning. Just because similar language has been used in some past cases to explain a traveler's duty to avoid collisions does not mean it cannot also be used to explain the traveler's general duty to exercise due care when crossing railroad tracks. The plain words of the instruction say no more.[34] There was no error.

### 2. Proximate Cause

■ Johnson's final assertion is that the court erred in giving the following proximate cause instruction:

"A proximate cause of an injury is a cause which, in natural and continuous sequence, produces the injury, and without which the injury would not have occurred."

Instruction No. 25. Johnson requested that the following be submitted instead:

"An act or omission is a proximate cause of an injury if it was more likely than not a substantial factor in bringing about the injury complained of."

Johnson argues that her proposed instruction correctly states the law of proximate cause under *Sharp v. Fairbanks North Star Borough*, 569 P.2d 178 (Alaska 1977), and preceding cases. We agree that the instruction could have conformed more closely to *Sharp*, but do not find the given instruction to be reversible error.

In *State v. Abbott*, 498 P.2d 712 (Alaska 1972), we identified the causal element of a negligence cause of action as:

"A reasonable close causal connection between the conduct and the resulting injury . . . . [proximate cause]." (brackets in original).

*Id.* at 725, quoting W. Prosser, The Law of Torts § 30, at 143 (4th ed. 1971). The principle in *Abbott* was re-affirmed in *Sharp*, where we stated:

"Among the elements adopted by this court as necessary to make out a claim for relief based on negligence is '[a] reasonable close connection between the conduct and the resulting injury . . . [proximate cause].' More specifically, negligent conduct may properly be found to be a 'legal cause' of a plaintiff's injury if the negligent act 'was more likely than not a substantial factor in bringing about the injury.' . . .

Normally, in order to satisfy the substantial factor test it must be shown *both*

---

frivolous. Johnson's objection was known to the parties and acknowledged by the court.

**33.** See *Alley v. Chicago, Rock Island & Pac. R.R.*, 213 Kan. 457, 516 P.2d 967 (1974) and authorities cited therein.

**34.** The instruction would be improved if modified by adding a qualifying phrase after "danger" such as "known or which should have been known."

that the accident would not have happened 'but for' the defendant's negligence and that the negligent act was so important in bringing about the injury that reasonable men would regard it as a cause and attach responsibility to it." (footnote omitted; emphasis in original).

569 P.2d at 181.

We believe the given instruction adequately conveyed these concepts. Johnson argues that the instruction was prejudicial because it omitted the "or omission" and the "substantial factor" language endorsed in *Sharp*. The given instruction *was* phrased in terms of an "act," and the use of "in natural and continuous sequence" also arguably implies acts. But whatever ambiguity is inferrable from that language is resolved when one considers all of the instructions given. Instruction No. 11 stated that the city "is liable for any injury caused by acts *or omissions* of its employees," and Instruction No. 23 provided that negligence can result from either "action or inaction." (emphasis added). Thus the jury was adequately advised that negligence can result from omissions.

Johnson's second argument presents a somewhat closer question. The issue reduces itself to whether the instruction indicated that an act or omission must have been *the* cause of the injury for liability to attach, or whether it need only be *a* cause. In *State v. Guinn*, 555 P.2d 530, 538 (Alaska 1976), we stated that to satisfy proximate cause it is not necessary that the actor's conduct be "the" cause, but rather that "[i]t is only necessary that such conduct be 'a' legal cause." Again, the given instruction adequately conveyed this concept. The instruction stated that "[a] proximate cause ... is *a* cause which ... produces the injury." (emphasis added). This was reinforced by Instruction No. 26 which stated, in part, that "[t]here may be more than one proximate cause of an injury." Johnson's

claim of error regarding the trial court's proximate cause instruction is rejected.

## STATE OF ALASKA'S CROSS–APPEAL

### I. Denial of Summary Judgment Seeking Discretionary Function Immunity

Prior to obtaining its directed verdict, the state moved for summary judgment on grounds, *inter alia*, that its conduct fell within the discretionary function exception of the Alaska Tort Claims Act. AS 09.50.-250. The motion was denied. The issue must be reached because we have reversed the directed verdict granted the state. In reviewing the rejected motion for summary judgment, we must determine whether the state met its burden of showing that there was no genuine issue of material fact and that it was entitled to judgment as a matter of law. *Jennings v. State*, 566 P.2d 1304, 1308–09 (Alaska 1977). We conclude that the state did not meet the second requirement. Further, because we conclude that on the merits the discretionary function immunity is not available, we decline to rule on Johnson's claim that the state waived this argument.

The discretionary function immunity derives from AS 09.50.250:

"A person or corporation having a ... tort claim against the state may bring an action against the state in superior court.... However, no action may be brought under this section if the claim

(1) is an action for tort, and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused ...."

We have addressed the discretionary function exception to governmental tort liability in several cases.[35] Beginning with

**35.** *See Japan Air Lines Co., Ltd. v. State*, 628 P.2d 934 (Alaska 1981); *Urethane Specialties, Inc. v. City of Valdez*, 620 P.2d 683, 687–89 (Alaska 1980); *Carlson v. State*, 598 P.2d 969, 971–73 (Alaska 1979); *Jennings v. State*, 566 P.2d 1304, 1311–13 (Alaska 1977); *Wallace v. State*, 557 P.2d 1120, 1124–26 (Alaska 1976); *Adams v. State*, 555 P.2d 235, 243–44 (Alaska 1976); *State v. I'Anson*, 529 P.2d 188, 191–97 (Alaska 1974); *State v. Stanley*, 506 P.2d 1284,

*State v. Abbott*, 498 P.2d 712, 717–22 (Alaska 1972), reaffirmed in *State v. I'Anson*, 529 P.2d 188, 192 n.12, 193 (Alaska 1974), and in *Jennings v. State*, 566 P.2d 1304, 1311–13 (Alaska 1977), we adopted the planning-operational test to determine whether a particular governmental function was within the ambit of the discretionary function immunity:

> "[D]ecisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability, while decisions that are merely operational in nature are not considered to be discretionary acts and therefore are not immune from liability."

*Carlson v. State*, 598 P.2d 969, 972 (Alaska 1979). This distinction is based on the *type* of decision being made, examined "within an analytical framework which is sensitive to the policies underlying the discretionary function or duty exception." *Id.* The policy underlying immunity is the necessity for "judicial abstention in certain policy-making areas that have been committed to other branches of government." *Id.* This policy in turn is based upon notions of separation of powers, and limitations on this court's ability to reexamine the questioned decision and the considerations that entered into it. *I'Anson*, 529 P.2d at 193; *Abbott*, 498 P.2d at 721. Thus, under the planning-operational test, decisions that rise to the level of planning or policy formulation will be considered discretionary acts immune from tort liability, whereas decisions that are operational in nature, thereby implementing policy decisions, will not be considered discretionary and therefore will not be shielded from liability. *Japan Air Lines Co., Ltd. v. State*, 628 P.2d 934, 936 (Alaska 1981). "In other words, the key distinction is between basic policy formulation, which is immune, and the execution or implementing of that basic policy, which is not immune." *Id.* Notably, however, liability is

the rule, immunity the exception. *Japan Air Lines*, 628 P.2d at 937; *Jennings*, 566 P.2d at 1311; *Adams v. State*, 555 P.2d 235, 244 (Alaska 1976); *Abbott*, 498 P.2d at 720.

In her complaint, Johnson alleged that the state was negligent in the design, signing, and maintenance of Phillips Field Road at the point where it intersects with the MUS spur track crossing. On appeal, the state argues that the first two of these functions are within the discretionary function immunity.

## A. Design Defects

■ The state urges us to hold that state highway design determinations are insulated from liability because they are basic policy decisions occurring at the planning level. It argues that this initial design immunity should extend until the state has notice, actual or constructive, that due to "changed physical conditions" the original design has produced a dangerous condition. It thus asks us, in part, to adopt the principles of *Baldwin v. State*, 6 Cal.3d 424, 99 Cal.Rptr. 145, 491 P.2d 1121 (1975).[36]

Here, the state did not initially design the road and crossing. Phillips Field Road was originally a gravel road constructed by the Alaska Railroad over its land. In 1956, the Railroad leased to the City of Fairbanks a portion of its land for the purpose of constructing and operating coal facilities and a spur track. In 1957, the spur track was constructed. In 1958, the Railroad granted the Bureau of Public Roads (BPR), a United States agency, an easement to improve and pave Phillips Field Road. The BPR was the agency responsible for the construction and maintenance of the public highway system in Alaska during territorial days. In May, 1961, the United States deeded its easement interest in Phillips Field Road to the state.

Thereafter, in 1970, the city reconstructed the MUS crossing, which it had pur-

---

1290–91 (Alaska 1973); *State v. Abbott*, 498 P.2d 712, 717–22 (Alaska 1972).

**36.** In California, initial design determinations covering state improvements are specifically immune by statute. In *Baldwin*, the California Supreme Court narrowed the statute by hold-

ing that the specific immunity is *not* perpetual; if the governmental entity has notice and if changed physical conditions produce a dangerous condition, the immunity will not apply. *Baldwin*, 491 P.2d at 1127.

chased in 1958. The reconstruction was completed pursuant to specifications *approved by* the state.[37] The angle at which the MUS crossing intersects Phillips Field Road was not altered by the 1970 reconstruction. There was no evidence that the flangeway groove was altered by this reconstruction.

Thus the state inherited a paved road, with an existing crossing, but subsequently approved its reconstruction utilizing the original design. This is the design decision for which the state urges immunity. It argues that "[t]he concept of initial design immunity should apply to decisions made by governmental entities that adopt or approve plans for public highway construction," and thus urges state immunity from liability for the initial plan or design "provided there is a reasonable basis for adopting or approving" it. This "reasonable basis for approval" would add a new element to the discretionary function analysis, and we decline to adopt it.

The decision of whether to have built the road or crossing was a planning decision involving a basic policy decision entrusted to a coordinate branch of government. *See Japan Air Lines*, 628 P.2d at 937 n.2; *Jennings*, 566 P.2d at 1311–12. However, once the state made the decision to construct the road and crossing, the discretionary function immunity did not protect it from possible negligence liability in the operational carrying out of the basic policy-planning decision to build. *Japan Air Lines*, 628 P.2d at 937 n.2. In other words, policy decisions cannot be implemented negligently. Immu-

nity can only be based on activity involving the formulation of basic policy which is entrusted to another branch of government.

Our prior decisions show that there is no blanket design immunity in Alaska. In *State v. I'Anson*, 529 P.2d 188 (Alaska 1974), we held that the state could be held negligent for failing to post a road warning sign in advance of the entrance of a side road and for failing to place no-passing striping on a rise in the road. Although we noted that these items could be characterized as design decisions, we rejected the state's argument that all design decisions are protected, *id.* at 192 n.11, and found that the state decision on signing and striping the road did not "involve broad basic policy decisions which come within the 'planning' category of decisions ... expressly entrusted to a coordinate branch of government." *Id.* at 193–94. Similarly, in *Japan Air Lines*, 628 P.2d 934, we held that the state could be held liable for injuries resulting from the possible negligent design of an airport runway.[38]

In the present case, the design decision made by the state in approving the reconstruction plans of the road and crossing involved were operational decisions which merely implemented the basic policy formulation decision to build an overlapping road and crossing at that location. Once the basic policy decision to continue the existence of the crossing and road was made, the state was obligated to use due care to make certain that the road met the standard of reasonable safety for users. The trial court

---

**37.** The city holds a utility permit for the railroad crossing from the state. The state admits that "[i]ssuance of a utility permit necessarily requires approval by the State of the City's specifications."

**38.** We have noted various other examples:
"Discretionary to undertake fire-fighting, light-house, rescue, or wrecked-ship marking services, but not discretionary to conduct such operations negligently; discretionary to admit a patient to an Army hospital, but not discretionary to treat the patient in a negligent manner; discretionary to establish a post office at a particular location, but not to negligently fail to establish handrails; discre-

tionary to establish control towers at airports and to undertake air traffic separation, but not to conduct the same negligently; discretionary to reactivate an air base, but not to construct a drainage and disposal system thereon in a negligent fashion; and discretionary for CAA to conduct a survey in low flying, twin engine airplane, but not for pilot thereof to fly negligently." (footnotes omitted).
*Abbott*, 498 P.2d at 722 n.29, *quoting United Airlines, Inc. v. Wiener*, 335 F.2d 379, 393 (9th Cir. 1964), *cert. dismissed*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964).

properly denied the state's motion seeking immunity for its design decision.[39]

### B. Inadequate Signing

 The failure to provide a sign warning bicyclists that the MUS crossing presented a particular hazard to them is the gravamen of Johnson's claim. The state acknowledged responsibility for both signing and maintaining Phillips Field Road, but it argues that the decision not to provide a sign warning of a particularized hazard falls within the initial design phase of decision-making and is immune "unless there is no reasonable basis for such a decision."

We conclude, however, that the decision to sign is operational and hence not immune. We reached a similar conclusion in *I'Anson*:

> "We now turn to the central issue in this review proceeding, namely, whether the placement of traffic signs and highway striping comes within the ambit of the discretionary function or duty exception . . . In the trial court, the questions in dispute turned on whether the state properly marked and striped a portion of the Seward Highway north of the Granite Creek Campground access road. In our view, functions of this nature do not involve broad basic policy decisions which come within the 'planning' category of decisions which are expressly entrusted to a co-ordinate branch of government. We are further persuaded that resolution of questions such as whether or not the state properly striped or marked a portion of the highway as it relates to the state's duty of care to users of the highway presents facts that courts are equipped to evaluate with traditional judicial fact-finding and decision-making processes."

*I'Anson*, 529 P.2d at 191–92, 193–94. Thus the trial court properly denied the state's motion for immunity.[40]

### II. Denial of Summary Judgment on Negligent Maintenance Count

 The state further asserts that the trial court erred in denying it summary judgment on the issue of its negligence in the maintenance of Phillips Field Road. Johnson argued that the asphalt pavement immediately adjacent to the running rails had eroded, and that as a result her bicycle tire may have caught on the tracks. In addition, she asserted that the asphalt pavement was not level in height with the running rails. On appeal, both parties argue from evidence that came before the court after its ruling on the motion. That evidence is not considered here; the correctness of the ruling must be judged on the basis of evidence before the court at the time of the ruling. 10 C. Wright & A. Miller, Federal Practice and Procedure § 2716, at 435–36 (1973). *See* 6 Moore, Federal Practice ¶ 56.27[1] (1980).

Below, the state argued there was "no showing that the granulated pavement next to the running rail contributed to her [Johnson's] accident." In evidence at that time were certain photographs depicting the granulated pavement. An eyewitness who was fifty to one hundred yards away from Johnson testified that Johnson's "front wheel caught something" (rather than testifying it caught between the asphalt and the first rail). Affidavits of eleven people who had accidents similar to Johnson's were before the court. Those affidavits established that something about the crossing was deflecting the front tires of bicycles.

On a motion for summary judgment all proofs must be viewed in the light most favorable to the non-moving party, *Gablick v. Wolfe*, 469 P.2d 391, 396 (Alaska 1970); and all inferences of fact must be drawn in favor of that non-moving party. *Alaska Rent-A-Car, Inc. v. Ford Motor Co.*, 526

---

**39.** Accordingly, it is unnecessary to reach the argument that changed circumstances may obviate an initial immunity.

**40.** That the type of sign Johnson asserts was necessary is "non-standard," that is, not provided for in the then current Alaska Traffic Manual, does not, in our view, make the decision to post such a sign a discretionary decision.

P.2d 1136, 1139 (Alaska 1974). Applying this standard, we conclude that there was sufficient evidence before the court to indicate that a maintenance defect may have contributed to Johnson's accident. There was a genuine issue of fact regarding the adequacy of the maintenance of Phillips Field Road where the spur track crosses it, and thus the trial court properly denied the state's summary judgment motion regarding the negligent maintenance count.

## CITY OF FAIRBANKS' CROSS–APPEAL

Finally, the city argues on cross-appeal that the trial court erred in excluding some one hundred photographs depicting forty-five railway crossings in the Portland, Oregon, area. The city sought to introduce the evidence to illustrate its expert witness' testimony that the MUS spur track crossing, although omitting a warning sign written specifically for bicyclists, nonetheless conformed to industry standards. Johnson objected on the ground that there was insufficient similarity between the Portland crossings and the MUS spur track crossing. The dissimilarities emphasized by Johnson were: (a) the inability of the witness to establish the quantity of bicycle traffic at the crossings; (b) the different flangeway construction and crossing materials of some of the depicted crossings; (c) the absence of a showing of any notice to the Portland municipality of any bicycle accidents occurring at any of these crossings; and (d) the absence of any showing of the number of accidents at any of the crossings.

The city argues that exclusion emasculated its defense of compliance with an industry standard. It contends that its expert's testimony was "intended to revolve around" the photographs, and that exclusion "deprived [it] of the most forceful and undeniable evidence disproving its alleged negligence: photographs from an exhaustive study which prove that its practices fully complied with applicable standards." It ar-

gues that the photographs were admissible under Alaska Rule of Evidence 705 and that the trial court, therefore, abused its discretion in excluding the evidence.

After noting the above dissimilarities between the crossings depicted in the photographs and that in the case before it, the trial court held that the pictures would be confusing to the jury and unhelpful in determining the condition of the MUS crossing. In addition, the court noted that it did not see how the photographs established an industry standard. The pictures were accordingly excluded.

Although the photographs were excluded, the expert witness was allowed to testify regarding his investigation of railway crossings in the Portland area. He was able to testify that he inspected forty-five crossings in that area and that none of these crossings were signed with specific reference to bicyclists. He further testified that based upon his investigation and research of engineering standards, industry standards did not require warning signs directed specifically at bicyclists.

Photographic evidence is admissible, as is other demonstrative evidence, if a proper foundation is laid showing that the photographs accurately depict the subject and if such evidence will be helpful to the jury. *Kaps Transport, Inc. v. Henry*, 572 P.2d 72, 75 (Alaska 1977). The trial court determined that the offered photographs would not be helpful, and would confuse the jury. A trial court has discretion to exclude relevant evidence if it determines that the evidentiary or probative value is outweighed by, *inter alia*, the danger of confusing or misleading the jury. Alaska R.Evid. 403;[41] *Stevens v. State*, 443 P.2d 600, 603 (Alaska 1968), *cert. denied*, 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969). Thus the issue is whether the trial court abused its discretion in excluding the offered photographs.

**41.** Alaska R.Evid. 403 provides:
"Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

▮ Significantly, of the seven Alaska cases cited by the city as addressing the admissibility of photographs, not one has reversed the trial court's decision to either admit [42] or exclude [43] the evidence. A reading of those cases and of the transcript establishes that the trial court did not abuse its discretion in excluding the offered photographs. The court carefully considered the appropriate factors and made a reasoned decision.

The city cites numerous cases in which the exclusion of photographic evidence of railway crossings was held to be error. However, in all but two of these cases the evidence depicted the particular crossing at issue or the immediately surrounding area.[44] The remaining two cases are inapposite. In *Cain v. Illinois Central Railroad Co.*, 266 F.2d 942, 945 (5th Cir. 1959), *cert. denied*, 361 U.S. 886, 80 S.Ct. 158, 4 L.Ed.2d 122 (1959), the court held that the trial judge erred in excluding a photograph of another crossing, where it was offered to show conduct by the *same defendant* at a similar crossing. In *Deshotel v. Atchison, Topeka & Santa Fe Railway Co.*, 114 Cal.App.2d 224, 300 P.2d 910, 912–13 (1956), the court upheld the trial judge's determination that the photographs were sufficiently similar to be admitted as probative evidence, stating that such a determination is primarily a trial court function. It thus affirmed the trial court's discretionary decision. Neither of these cases support reversal here.

The trial court did not abuse its discretion in excluding the city's proffered photographic evidence of railway crossings in the Portland area.[45]

## CONCLUSION

Actual or constructive notice of a dangerous road condition is necessary *unless* the government entity itself created the dangerous condition. Thus, the court erred in ruling that actual or constructive notice is always a prerequisite of liability. As to Johnson's appeal, the directed verdict in favor of the state and the jury verdict in favor of the city are reversed.

Reversal requires that we reach the cross-appeals. As to the state's appeal, the trial court correctly rejected the state's motion for summary judgment on the negligent maintenance count. There was sufficient evidence to create a jury question. The trial court also correctly held that the state

---

**42.** See *Condon v. State*, 498 P.2d 276, 281 (Alaska 1972) (upholding admission of photographs of wife's bruised body in murder prosecution); *Sleziak v. State*, 454 P.2d 252, 261 (Alaska 1969), *cert. denied*, 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969) (upholding admission of photographs of victims in murder prosecution); *Stevens v. State*, 443 P.2d 600, 604 (Alaska 1968), *cert. denied*, 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969) (to same effect); *Watson v. State*, 387 P.2d 289, 294 (Alaska 1963) (to same effect); *McIntyre v. State*, 379 P.2d 615, 617 (Alaska 1963) (to same effect).

**43.** See *Kaps Transport, Inc. v. Henry*, 572 P.2d 72, 75–76 (Alaska 1977) (upholding exclusion of photographs intended for impeachment purposes where insufficient foundation provided); *Maze v. State*, 425 P.2d 235, 239–40 (Alaska 1967) (upholding exclusion of photograph of burglarized area, taken three months after the offense, where no similarity of circumstances shown).

**44.** See *Colley v. Standard Oil Co.*, 157 F.2d 1007, 1009 (4th Cir. 1946); *Illinois So. Ry. Co. v. Hayner*, 225 Ill. 613, 80 N.E. 316, 318 (1907); *Flint v. Chicago, Burlington & Quincy R.R. Co.*,

357 Mo. 215, 207 S.W.2d 474, 480 (1947); *Kansas City So. Ry. Co. v. Waters*, 120 Okl. 1, 249 P. 742, 743 (1926); *Dederichs v. Salt Lake City R. Co.*, 14 Utah 137, 46 P. 656, 657 (1896).

**45.** The city's argument that Alaska Rule of Evidence 705 mandates admission of the photographs is wide of the mark. It argues that Evidence Rule 705 *requires* admission of the facts and data underlying an expert's testimony. But the rule requires no such thing. As the commentary to the rule notes, the rule was intended to *eliminate* such a requirement. Evid.R.Commentary 705(a). In addition, the balancing test for admission under Rule 705 parallels that under Evidence Rule 403. See Evid.R.Commentary 705(c). The trial court applied the latter test here, and reasonably concluded that the probative value of the photographs was outweighed by the danger of jury confusion.

Although the Alaska Rules of Evidence were not in effect at the time of the trial, Rule 705 is reflective of the common law rules. Thus, analysis under this rule is applicable to trials occurring before August 1, 1979.

could not avail itself, on these facts, of the discretionary function exception to governmental tort liability.

As to the city's appeal, the trial court acted within its discretion in excluding the proferred pictures of the Portland railway crossings.

REVERSED in part, AFFIRMED in part, and REMANDED.

MATTHEWS, J., not participating.