**Nicholas W. BRIGMAN, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–8044.

Court of Appeals of Alaska.

Feb. 14, 2003.

---

Brent R. Cole and Colleen J. Moore, Marston & Cole, Anchorage, for Appellant.

John T. Baker, Assistant Attorney General, Anchorage, Joseph S. Slusser, Assistant District Attorney, and J. Michael Gray, District Attorney, Kodiak, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and
MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Nicholas W. Brigman appeals his conviction for possessing and/or transporting game that he knew, or should have known, had been taken in violation of Alaska's hunting regulations.[1] This conviction arose from Brigman's assistance to a hunter who was successful in the spring 2000 drawing for brown bear hunting permits on Kodiak Island.

The hunter's permit allowed him to kill a brown bear in Permit Hunt Area 258, the "Wild Creek" area. However, the hunter tracked his bear into an adjacent hunting area, Permit Hunt Area 232, and killed the bear there. Brigman was convicted of helping transport the skin, skull, and body parts of the bear when he either knew or should have known that the hunter had violated the

---

1. 5 AAC 92.140(a).

terms of his permit by killing the bear outside the designated permit hunt area.

The main issue raised in this appeal is Brigman's challenge to the manner in which the Department of Fish and Game established the various permit hunt areas on Kodiak Island. These permit hunt areas were all established by internal decision within the Department. Brigman contends that this is illegal for two reasons. First, he argues that no statute or regulation authorizes the Department to establish permit hunt areas. Second, Brigman argues that even if the Department has the authority to establish permit hunt areas, it can not do so by internal decision; instead, the Department must enact a regulation under Alaska's Administrative Procedure Act, AS 44.62, if it wishes to establish (or modify) the permit hunt areas.

For the reasons explained here, we conclude that the Department of Fish and Game defined the permit hunt areas pursuant to the authority granted by a now-repealed regulation, former 5 AAC 81.055(18). We further conclude that the permit hunt areas are not "rules ... or standards of general application" within the meaning of AS 44.62.640(a)(3), which means that the Administrative Procedure Act does not apply to the Department's action. Thus, pursuant to the authority granted by the former regulation, the Department could lawfully define the permit hunt areas by internal decision.

*Legal background of this case*

The State of Alaska is divided into twenty-six major game management units, some of which are divided into as many as six smaller sub-units (*e.g.*, Unit 1(A), Unit 26(C)). *See* 5 AAC 92.450. Brigman's appeal requires us to examine the rules that govern the hunting of brown bears in Game Management Unit 8, which comprises Kodiak Island and its neighboring islands south of the Shelikof Strait.

Each year, the Department of Fish and Game establishes the rules that will govern the drawing permit hunts for game animals in Alaska.[2] The Department establishes permit hunt areas for different species of game, fixes the number of permits that will be issued for each permit hunt area, sets out the procedures for applying for a permit, and announces any supplemental conditions that will govern permit hunting in each area (in addition to the conditions and procedures mandated by 5 AAC 92.050). By law, all of this information is published in an annual "permit supplement".[3]

For years, the Department has divided Game Management Unit 8 into some thirty "permit hunt areas" for the hunting of brown bears. These permit hunt areas are not defined by "metes and bounds" descriptions, but rather are drawn on a topographical map that is published as part of the annual permit supplement. Each of the permit hunt areas is designated by a pair of identifying numbers—one number for the fall hunt, and the other for the spring hunt. In an accompanying table, the permit hunt areas are also identified by a geographic name (*e.g.*, "West Ugak Bay", "Sturgeon River").

The Department's map, which is reproduced here, will have a familiar look to any reader who has played such games as Diplomacy© or Risk©.

---

**2.** *See* 5 AAC 92.049.

**3.** *See* 5 AAC 92.049(b).

The main issue in this appeal is Brigman's legal challenge to the way the Department set the boundaries of these permit hunt areas.

Several years ago, Title 5 of the Alaska Administrative Code (5 AAC) contained a regulation that expressly authorized the Department to set the boundaries of permit hunting areas for brown bears in Game Management Unit 8.[4] That regulation has since been repealed, but both the Department and the Board of Game continue to use the permit hunt areas defined by the Department.

It may be that the Department actively reconsiders the boundaries of the permit hunt areas annually, and it is just happenstance that the permit hunt areas on Kodiak Island have remained unchanged for years. Alternatively, the Department may re-affirm the existing boundaries more or less automatically each year, without active consideration of other potential boundaries. Or the Department may believe that, because the regulation that expressly authorized the Department to create permit hunt areas has now been repealed, the Department no longer has the authority to modify the hunting areas that were created under that former regulation.

Whatever the case may be, Brigman's legal challenge to the permit hunt areas is ultimately the same. The fact remains that the boundaries of the permit hunt areas have been set by internal decision within the Department. Brigman contends that this violates Alaska's Administrative Procedure Act. Specifically, he argues that even if the De-

4. *See* former 5 AAC 81.055(18) (Register 71, October 1979).

partment is (or was) authorized to define permit hunt areas, it could not do so by internal decision, but rather had to do so by enacting a regulation in conformity with the procedures specified in Alaska's Administrative Procedure Act, AS 44.62. That is, Brigman asserts that the Department could not establish permit hunt areas without giving the public advance notice of its proposed action and without holding a public hearing on the proposed hunting areas and their specific boundaries. *See* AS 44.62.180–290.

*Factual background of this case*

An Anchorage resident, Lorne Smette, was a successful applicant for a spring 2000 brown bear permit on Kodiak Island. Smette's permit was issued for Permit Hunt Area 258, the "Wild Creek" area. That is, Smette was only authorized to take a brown bear within Area 258.

Smette was an inexperienced hunter, and he wanted someone to assist him. Through an intermediary, he negotiated with Brigman, whose wife owns a lodge on Kodiak Island. Brigman agreed to help Smette in his hunting venture. For $4000, Brigman provided Smette with a camp, equipment, food, and transportation from the lodge to the permit hunt area. He also arranged to have Roy Lesher, an employee at the lodge, accompany Smette on his hunt.

Smette arrived at Brigman's lodge on April 24, 2000. Smette conducted a reconnaissance of the permit hunt area on April 25th, accompanied by Brigman. On April 27th, Smette went hunting, accompanied by Lesher. The hunt was unsuccessful. The next day, April 28th, Smette and Lesher traveled farther up Hidden Basin Creek. In doing so, the two men crossed the boundary of Permit Hunt Area 258 and entered the adjacent hunting area—Area 232 (the "West Ugak Bay" area).

About a mile and a half into Area 232, Smette and Lesher shot and killed a brown bear. They began to skin the bear, but it was late in the day, so they left the carcass and Brigman transported them back to the lodge. The following day, Brigman accompanied Smette and Lesher to the kill site. Brigman himself skinned the bear's head and paws. He also cut out the bear's gall bladder and saved it for himself.

After the skinning was completed, Brigman used his skiff to transport Smette, Lesher, and the bear's skin, skull, and gall bladder back to the lodge.

Brigman was charged with several offenses arising from this episode. For purposes of this appeal, the pertinent charge was that Brigman violated 5 AAC 92.140(a), a regulation that forbids a person from possessing, transporting, giving, receiving, or bartering game or game parts if the person knows or should know that the game was taken in violation of Title 16 of the Alaska Statutes or any regulation adopted under Title 16.

At trial, Brigman conceded that he possessed and transported the bear parts from Smette's hunt, but he argued that the boundaries of the permit hunt areas were so vague and inexact that he had no reasonable way of knowing that the bear was killed in the wrong area. The jury rejected Brigman's argument and convicted him of this offense.

*Is the Department of Fish and Game authorized to subdivide the state's game management units into smaller permit hunt areas?*

In Alaska, no one may take, possess, or transport game (or any part of a game animal) unless the taking, possession, or transportation is authorized by AS 16.05–16.40 or by a regulation adopted under those statutes.[5] Smette was successful in the permit lottery for the spring 2000 brown bear hunt, but he was obliged to obey the conditions of his permit.[6] Smette's hunting permit limited him to Permit Hunt Area 258. The State's core allegation against Brigman was that he possessed and transported a bear skin, skull,

---

5. AS 16.05.920(a).

6. *See* 5 AAC 92.990(16), which states: " 'drawing permit' means a permit issued to a person who is one of a limited number of people selected by means of a lottery held for people who have submitted a valid application for the permit and who agree to abide by the conditions specified for each hunt[.]"

and gall bladder when he knew or should have known that the bear was killed in violation of the terms of Smette's hunting permit—that is, killed outside Permit Hunt Area 258.

■ Brigman argues that the Department of Fish and Game had no authority to limit Smette's hunting activities to Permit Hunt Area 258 because the Department ultimately has no authority to establish permit hunt areas at all. Brigman points out there is a regulation, 5 AAC 92.450, that defines the various game management units within Alaska, but there appears to be no regulation that either (1) defines smaller permit hunt areas within these game management units, or that (2) authorizes the Department to define permit hunt areas within the game management units.

The State counters that the Department's authority to establish permit hunt areas is recognized in 5 AAC 92.052, "Discretionary Permit Hunt Conditions and Procedures". This regulation lists some twenty restrictions and conditions that the Department "may [in its discretion] apply ... to a permit hunt, when necessary for management of the species hunted". Among the conditions listed in this regulation, number (7) speaks of permit hunt areas:

> (7) [The Department may direct that] only a specified number of permittees may hunt during the same time period, and [that] a permittee may hunt only in a specified subdivision within the permit hunt area[.]

The State argues that this portion of the regulation grants the Department the authority to create permit hunt areas. But this does not appear to be correct.

The regulation grants the Department the authority to limit hunters to "a specified subdivision" within a particular "permit hunt area". At best, this regulation grants the Department the authority to define "subdivisions" within a permit hunt area. But the

regulation does not authorize the Department to create permit hunt areas. Rather, it seems to assume a pre-existing system of permit hunt areas.

This same assumption—a pre-existing system of permit hunt areas—is clearly found in 5 AAC 92.061(5), a regulation enacted by the Board of Game that lists nine of the Kodiak Island permit hunt areas by name, and specifies them as areas where special conditions govern the hunting of female brown bears.

The record in the present appeal does not reveal when the Department created the brown bear permit hunt areas in Game Management Unit 8. However, as we noted above, a 1979 regulation—former 5 AAC 81.055(18)—explicitly granted the Department this power:

> [P]ermits for hunting brown bear in [Game Management] Unit 8 shall be issued on the basis of a minimum of 60 percent of the total available permits *within hunting areas established by the commissioner*
> . . . .

(Register 71, October 1979) (emphasis added).

Thus, by 1979 at the latest, the Board of Game had authorized the Department of Fish and Game to create permit hunt areas on Kodiak Island (and on the other islands contained in Game Management Unit 8). It may be true that the current regulations no longer expressly give the Department this authority, but it is evident that the current regulations ratify a system of permit hunt areas already in place.

The parties to this appeal agree that the permit hunt areas on Kodiak Island have existed for years, but the record does not reveal exactly when the Department defined these areas. In the absence of evidence to the contrary, we follow the presumption of regularity—the presumption that public officers have properly discharged their official duties.[7] In Brigman's case, we presume that

---

7. *Wright v. State,* 501 P.2d 1360, 1372 (Alaska 1972), quoting *Gallego v. United States,* 276 F.2d 914, 917 (9th Cir.1960).

This principle has been repeatedly applied by both the Alaska Supreme Court and this Court. *See Finkelstein v. Stout,* 774 P.2d 786, 790 (Alas-

ka 1989) (applying the principle to a case involving absentee ballots, but holding that the presumption of regularity was rebutted); *Tallman v. Dept. of Public Works,* 506 P.2d 679, 681 (Alaska 1973) (applying the presumption to reject a challenge to the array of a jury panel); *Wallace v.*

the Department of Fish and Game defined the permit hunt areas within Game Management Unit 8 when the Department had express authority to do so.

Because the Department was once authorized to create permit hunt areas for the hunting of brown bears in Game Management Unit 8, and did so, and because no statute or regulation has abolished the permit hunt areas created by the Department (indeed, the current regulations assume the existence of those permit hunt areas), we conclude that the existing permit hunt areas within Unit 8 were lawfully created—*if* the Department could create these hunting areas without following the procedures specified in the Administrative Procedure Act. That issue is addressed in the next section of this opinion.

*Was the Department of Fish and Game obliged to follow the Administrative Procedure Act when it established the brown bear permit hunt areas in Game Management Unit 8?*

■ Brigman argues that even if the Department was authorized to create the brown bear permit hunt areas in Game Management Unit 8, the Department was obliged to follow the Administrative Procedure Act, AS 44.62, when it created these hunting areas. That is, Brigman asserts that the Department was obliged to publicly announce its intention to establish the system of permit hunt areas, then to hold public hearings on this proposal, and finally to codify the permit hunt areas in a regulation published in the Alaska Administrative Code.[8] The State responds that the Department could lawfully establish the permit hunt areas by internal decision.

The key to resolving this issue is the definition of "regulation" codified in AS 44.62.640(a)(3)—for the Administrative Procedure Act governs an agency's actions only if those actions constitute "regulations" within this statutory definition.

AS 44.62.640(a)(3) declares that, for purposes of the Administrative Procedure Act, the term "regulation" means

every rule, regulation, order, or standard of general application ... adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure [except for rules that relate only to the internal management of the agency].

Brigman argues that the system of brown bear permit hunt areas constitutes a "rule ... or standard of general application", and thus the Department had to comply with the mandates of the Administrative Procedure Act when the Department defined those hunting areas.

The State argues that the permit hunt areas should not be deemed "rules of general application" because they do not apply to the hunting population in general, nor do they fix the boundaries of brown bear hunting in general. Rather (the State argues), each defined permit hunt area governs the activities of only the few hunters who succeed in obtaining a brown bear hunting permit for that hunting area in the annual permit lottery. In the State's view, the boundaries of the permit hunt areas are simply one of the many conditions or limitations that govern a hunter's use of their particular permit.

The words of the statute are not particularly helpful in resolving this dispute. The system or grid of permit hunt areas applies to all persons who wish to hunt brown bears in Game Management Unit 8, so in one sense this system of hunting areas is a "rule ... of general application ... adopted by [the Department of Fish and Game] to implement ... the law enforced or administered by it". But in another sense, the particular geographical boundaries of these permit hunt areas do not constitute "rules" or "standards" because they do not govern or restrict

*State*, 933 P.2d 1157, 1162 (Alaska App.1997) (applying the presumption to conclude that the use of National Guard troops had been properly authorized); *Jerrel v. State*, 851 P.2d 1365, 1372 (Alaska App.1993) (presuming, in the absence of a contrary showing, that the trial court acted in

accordance with its earlier ruling); *Houston Hult v. State*, 843 P.2d 1262, 1266–67 (Alaska App. 1992) (applying the presumption of regularity to a chain of custody issue).

**8.** *See* AS 44.62.180–290.

hunters' activities in the same manner as the rules that (for example) specify the hunting season, or restrict the type of transportation or weapon that hunters may use, or that prohibit the killing of animals of a particular size or sex. Although the various permit hunt areas may differ in terms of ease of access or likelihood of a successful hunt, the hunting permits are awarded by lottery— thus giving all hunters the same chance to obtain access to any particular permit hunt area.

For these reasons, it is unclear whether the system of permit hunt areas should be viewed as a "rule ... of general application" within the meaning of AS 44.62.640(a)(3). Both Brigman and the State advance policy arguments in favor of their viewpoints. We do not find either of these policy arguments convincing.

Brigman asserts that, if the Department is not forced to establish the permit hunt boundaries through the procedures codified in AS 44.62, hunters will be denied due process because they will not have "adequate notice of [their] potential criminal conduct". But, as we explained above, 5 AAC 92.049(b) obliges the Department to annually publish a "permit supplement" that describes the permit hunt areas, announces the number of permits that will be issued for each area, sets out the procedures for applying for a permit, and specifies any supplemental conditions that will govern permit hunting in each area (in addition to the conditions and procedures mandated by 5 AAC 92.050). While one might argue that the Department should seek public input before it decides all these parameters of permit hunting, there is ample public notice of the Department's decision. Moreover, all successful permit applicants are individually notified of the conditions that govern their individual permits. For these reasons, we reject Brigman's contention that the Department's practice of establishing permit hunt areas by internal decision denies hunters fair notice of the geographical restrictions on their hunt.

The State, for its part, argues that unless the Department is free to define permit hunt areas by internal decision, the Department will be unable to adequately manage game resources. The State contends that the number of permit hunt areas, and their individual boundaries, must be re-assessed on a regular basis to ensure the health of the brown bear population. And the State further contends that it would be impossible to adequately perform this assessment if the Department were forced to go through the regulation-enactment process specified in AS 44.62.

The State's argument might have more force if the Department regularly adjusted the permit hunt areas (their number and/or their boundaries). But there is nothing in the record to indicate that the Department has altered the permit hunt areas since they were created. In fact, as we explained above, the Board of Game has incorporated nine of these permit hunt areas in a permanent regulation, 5 AAC 92.061—thus suggesting that the Board of Game, at least, treats the permit hunt areas as a more or less permanent fixture of the bear-hunting landscape.

To resolve Brigman's case, we have examined several decisions of the Alaska Supreme Court in which the court has interpreted and applied AS 44.62.640(a)(3): *State v. Tanana Valley Sportsmen's Association*, 583 P.2d 854, 858–59 (Alaska 1978); *Kenai Peninsula Fisherman's Cooperative Association v. State*, 628 P.2d 897, 904–06 (Alaska 1981); *Gilbert v. Dept. of Fish and Game*, 803 P.2d 391, 396–97 (Alaska 1990); *Usibelli Coal Mine, Inc. v. Dept. of Natural Resources*, 921 P.2d 1134, 1148–49 (Alaska 1996); *Kachemak Bay Watch, Inc. v. Noah*, 935 P.2d 816, 825–26 (Alaska 1997); and *Jerrel v. Dept. of Natural Resources*, 999 P.2d 138, 142–44 (Alaska 2000). Among these supreme court decisions, we conclude that *Kachemak Bay Watch, Inc. v. Noah* controls our resolution of Brigman's case.

The issue in *Kachemak Bay Watch* was the Department of Natural Resources' authority to divide the state into districts for aquaculture. The legislature had enacted a statute, AS 38.05.855(a), which required the Department to "identify districts in the state within which sites [could] be selected for the establishment and operation of aquatic farms

and related hatcheries".[9] Once the Department designated these districts, the Department would then receive and consider applications for permits to engage in aquaculture within each defined district.[10]

Kachemak Bay Watch challenged the Department's authority to designate the aquaculture districts by internal decision. They argued that the Department was obliged to define these districts by regulation, pursuant to the Administrative Procedure Act. But the supreme court rejected this argument.

The supreme court ruled that the system of districts would not necessarily constitute a "regulation" simply because it affected the public in general ways. Quoting a decision of the D.C. Circuit Court of Appeals, *Batterton v. Marshall*[11], the supreme court acknowledged that "many ... internal agency practices affect [the public]—often in significant ways".[12] But the court suggested that an agency's action would normally not be deemed a "regulation" if it did not "alter the rights or interests of the parties".[13]

The court conceded that it was "a close question" whether the Department's designation of the aquatic farming districts constituted a "regulation" for purposes of the Administrative Procedure Act.[14] However, the court concluded that the system of districts did *not* constitute a regulation:

[I]dentification [of the districts] does not alter the rights of the parties, does not deprive any party of a fair opportunity for public participation, embodies no finding as to a particular [permit] application[,] and does not establish criteria by which particular [permit] applications should be evaluated.

"Agencies often make discretionary decisions not requiring formal· procedures." *Olson v. State, Dep't of Natural Resources*, 799 P.2d 289, 292 (Alaska 1990). "We have described an agency's discretionary decision that does not require formal procedures as 'quasi-executive[.]' " *Kodiak Sea-*

*food Processors [Association v. State* ], 900 P.2d [1191,] 1197 [ (Alaska 1995) ]. We review such decisions only for an abuse of discretion. *Id.*

[The Department of Natural Resources] regularly makes decisions that are quasi-executive in nature and do not constitute regulation under the APA even when one or more indices of a regulation are present. *See Olson*, 799 P.2d at 292. For instance, the Commissioner does not identify by regulation those lands made available for oil and gas leases, mineral leases, or timber sales. *See* AS 38.05.180(b), AS 38.05.135-175, and AS 38.05.115. The legislature's assignment of a task to an agency, such as the identification of districts at issue here, invariably involves the exercise of agency discretion.

District identification is the first step in a lengthy, detailed public process of determining what aquatic farm will be allowed in what location. The legislature's established procedures under the Act do not include requiring the identification of districts by regulation.

*Kachemak Bay Watch*, 935 P.2d at 825-26. The supreme court therefore concluded that the Department's identification of aquatic farm districts did not constitute a "regulation" under the Administrative Procedure Act.

If anything, the facts of Brigman's case point more strongly toward this conclusion than the facts presented in *Kachemak Bay Watch*—for brown bear hunting permits are awarded by lottery, and thus all applicants have an equal chance to secure a permit in any specified permit hunt area. Therefore, based on the supreme court's decision in *Kachemak Bay Watch*, we' conclude that the Department of Fish and Game's designation of the permit hunt areas in Game Management Unit 8 does not constitute a "regulation" for purposes of the Administrative Procedure Act. Thus, the Department could

**9.** *Kachemak Bay Watch, Inc. v. Noah*, 935 P.2d at 821.

**10.** *Id.*

**11.** 648 F.2d 694, 707 (D.C.Cir.1980).

**12.** *Kachemak Bay Watch*, 935 P.2d at 825.

**13.** *Id.*

**14.** *Id.*

legally define the brown bear permit hunt areas by internal decision.

For these reasons, we reject Brigman's argument that the permit hunt areas are invalid. The State could lawfully prosecute Brigman for possessing or transporting game that he knew or should have known was taken outside the boundaries of the permit hunt area specified in Smette's brown bear hunting permit.

We now turn to the other arguments that Brigman raises in his appeal.

*Brigman's request for a jury instruction on the affirmative defense that he possessed and transported the illegally taken bear for the sole purpose of salvaging the meat*

At trial, Brigman conceded that he possessed and transported the bear skin, skull, and gall bladder, and he ultimately conceded (in his summation to the jury) that the bear was taken in the wrong permit hunt area. But Brigman argued that the map depicting the permit hunt area boundaries was unclear, and therefore he did not know—nor could he reasonably be expected to know—that the bear was killed outside Smette's allotted permit hunt area, Area 258. Thus, according to Brigman, the State had failed to show that he acted negligently with regard to the circumstance that the bear was taken illegally.

At the close of the trial, Brigman asked for a jury instruction on a different theory of defense—the affirmative defense that his possession and transportation of the bear was done for the sole purpose of salvaging the meat. This affirmative defense grew out of the Alaska Supreme Court's decision in *Gudmundson v. State.*[15]

*Gudmundson* involved two hunters who killed a sheep in an area closed to hunting and then confronted a legal dilemma. On the one hand, AS 16.30.010(a) required the hunters to salvage the meat so that it would not be wasted; but on the other hand, 5 AAC 92.140 prohibited them from possessing the sheep or transporting it anywhere (because it had been taken illegally). The hunters chose

to leave the sheep where it was. Later, after an anonymous caller alerted the authorities to the illegal kill, the two hunters directed the authorities to the kill site. But by the time the authorities were able to reach the sheep, the meat was maggot-infested and inedible, so the hunters were charged with wanton waste under AS 16.30.010(a).[16] The supreme court ruled that, because of the hunters' legal dilemma, they were denied due process of law when the State charged them with wasting the sheep's meat.[17]

Following the supreme court's decision in *Gudmundson,* a new section was added to 5 AAC 92.140, the regulation that forbids the possession or transportation of illegally taken game. This new section, 92.140(d), states:

> Notwithstanding [the prohibition on the possession or transportation of illegally taken game], it is an affirmative defense to the crime of unlawful possession or transportation of game, if the person who possesses and transports game or parts of game taken in violation of AS 16 or a regulation adopted under AS 16 is doing so for the sole purpose of salvaging that game ..., immediately salvages that game or parts of game from the field[,] and immediately surrenders that game or parts of game to a representative of the state located at the nearest office of the Department of Fish and Game ... or Department of Public Safety....

When the parties were discussing jury instructions at the close of Brigman's trial, Brigman asked for an instruction on this affirmative defense. The trial judge, Superior Court Judge Fred J. Torrisi, found no evidence to warrant this instruction. On appeal, Brigman challenges Judge Torrisi's decision on two grounds.

■ First, Brigman asserts that the "salvage" defense is actually a new element of the crime—so that when defendants are tried for possession or transportation of illegally taken game, juries must always be apprised of this potential defense, and the State must disprove the defense beyond a reasonable

**15.** 822 P.2d 1328 (Alaska 1991).

**16.** *Gudmundson,* 822 P.2d at 1329.

**17.** *Id.* at 1332–33.

doubt. This is simply a misreading of the regulation. The regulation refers to the salvage defense as an "affirmative defense".

The term "affirmative defense" is not defined in Title 5 of the Administrative Code, so it is not clear whether this term (as used in the regulation) means the same thing as it means in Title 11—*i.e.*, a defense on which the defendant bears the burden of proof by a preponderance of the evidence. *See* AS 11.81.900(b)(2). But regardless of which side is meant to bear the ultimate burden of proof, we construe the regulation to mean (at least) that defendants bear the burden of raising the issue and presenting evidence to support a finding in their favor.[18] Thus, Brigman is wrong when he asserts that juries must always be instructed on this defense.

■ This brings us to Brigman's second challenge to Judge Torrisi's ruling. As explained above, the judge ruled that Brigman had failed to present any evidence to support a finding in his favor on the proposed salvage defense.

The evidence at trial showed that, after Smette killed the bear, Brigman, Smette, and Lesher brought the bear skin and skull to the Kodiak office of the Department of Fish and Game—but they did this so that the skin and skull could be sealed (as required by regulation [19]), not salvaged. Smette and his companions did not bring the bear meat to the Kodiak office, nor did they surrender the skin to the Fish and Game officer (other than temporarily), nor did they tell the officer that they had taken the bear illegally. Instead, they told the officer that the bear had been killed lawfully, in conformity with Smette's hunting permit.

As explained above, this remained Brigman's position at trial. He contended that he believed that the kill was lawful—and that, if by chance the kill was not lawful, there was no reasonable way for him to know this. He has never contended that he or Smette intended to relinquish any part of the bear to the Department for salvage.

Given this evidence, Judge Torrisi lawfully refused Brigman's request for a jury instruction on the salvage defense codified in 5 AAC 92.140(d).

*Judge Torrisi's refusal to re-open the evidence so that the jury could be apprised that the State had dropped all charges against Smette*

■ Before Brigman's trial, Smette negotiated a plea bargain with the State. The State allowed Smette to plead no contest to a "violation"—that is, a strict liability, quasi-criminal offense that carried a penalty of up to a $300 fine and forfeiture of the bear skin—in return for Smette's testimony against Brigman. When Smette testified at Brigman's trial, the jury was informed of the details of Smette's plea bargain.

Then, on the morning of closing arguments, the prosecutor informed Judge Torrisi and Brigman's attorney that his boss, the Kodiak district attorney, had decided to dismiss all charges against Smette. The prosecutor assured Judge Torrisi that the change was initiated solely by the Kodiak district attorney, without consulting Smette, because the district attorney had concluded that Smette "was more a victim than anything else". The prosecutor further assured the judge that Smette had "had no inkling" that he might ultimately get a better deal than the one he negotiated.

Nevertheless, Brigman's attorney asked Judge Torrisi to tell the jury that all charges against Smette had been dismissed. When Judge Torrisi asked why this information was relevant, the defense attorney answered that it was relevant "to the State's perception [of the case]".

After hearing the defense attorney's explanation, Judge Torrisi ruled that the information was not relevant unless there was some evidence that Smette had prior knowledge of the better deal. The judge told the defense attorney that he had the right to interview Smette (to investigate the prosecutor's assertion that the change in the deal was the State's unilateral decision). The judge fur-

---

**18.** *See Trout v. State,* 866 P.2d 1323, 1324–25 (Alaska App.1994).

**19.** *See* 5 AAC 92.165.

ther stated that, if there was evidence that Smette was aware of the deal, the defense attorney would "have a good motion".

Judge Torrisi's ruling would have been questionable if Brigman had wanted to use this information to attack Smette's credibility. Compare our decision in *Braund v. State*, 12 P.3d 187, 191 (Alaska App.2000). Had Brigman wanted to delve into Smette's understanding or hopes concerning the district attorney's ultimate decision regarding Smette's charges or sentence, Brigman might well have been entitled to do this. We do not say that Brigman would have been entitled to precisely what he asked for—*i.e.*, entitled to simply have the jury instructed that the charge against Smette had been dropped. If the issue was to be litigated, both parties would be entitled to present their side of the issue: Brigman would have been entitled to re-open the evidence to elicit the fact that the charge against Smette had been dropped, and the State would have been entitled (if it wished) to present testimony to explain why the district attorney had done so.

But when Brigman argued this point to Judge Torrisi, he did not argue that the State's decision to drop the charge was relevant to assessing Smette's state of mind—his potential motives and, thus, his credibility as a witness. Nor does Brigman raise this argument on appeal. In fact, Brigman now affirmatively asserts that the dismissal of the charge against Smette "was *not* a deal" (emphasis added), and that the district attorney dropped the charge "without [receiving] any consideration from Mr. Smette".

Rather, Brigman argues (as he did in the trial court) that the State's decision to drop the charge was relevant to the *district attorney's* state of mind—the district attorney's perception of the case. Brigman argues that the district attorney's decision to drop the remaining strict-liability charge against Smette was, in effect, a concession by the district attorney that he "no longer believed that the bear was taken illegally"—*i.e.*, no longer believed that the bear was taken in the wrong permit hunt area.

■ This does not follow. As we recently pointed out in *State v. District Court*, the State "[has] the discretion to decide whether to bring charges against a person who has broken the law and, if so, to decide what those charges will be".[20] Quoting the Nebraska Supreme Court in *State v. Blair*[21], we said:

> [A] prosecutor is not obliged to present all charges which the evidence might support. Nor is it desirable that he prosecute all crimes at the highest degree available.... In exercising discretion in this way, the prosecutor is not neglecting his public duty or discriminating among offenders. The public interest is best served and even-handed justice best dispensed not by a mechanical application of the "letter of the law" but by a flexible and individualized application of its norms through the exercise of the trained discretion of the prosecutor as an administrator of justice.

*State v. District Court*, 53 P.3d at 632.[22]

■ We agree with Judge Torrisi that the Kodiak district attorney's decision to dismiss the remaining charge against Smette was not relevant to show how the government construed the evidence. The State is not obliged to prosecute every violation of law, and the State's ability to dismiss charges in the interest of justice is not limited to circumstances where the defendant is factually innocent. As the Eleventh Circuit Court of Appeals observed when it rejected an analogous claim (a claim that the trial judge should have allowed the defendant to apprise the jury that the government had dismissed charges against the defendant's co-conspirator), "[W]e cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty".[23]

Moreover, Brigman's attorney himself conceded, during final argument, that it "[did]

**20.** 53 P.3d 629, 633 (Alaska App.2002).

**21.** 230 Neb. 775, 433 N.W.2d 518 (1988).

**22.** Quoting *Blair*, 433 N.W.2d at 521.

**23.** *United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir.1990).

appear that [the bear] was taken in violation of the law, on the wrong side of the boundary"—*i.e.*, in the wrong permit hunt area. Brigman's defense at trial was not that the bear might have been killed legally, but rather that he and his companions had no reasonable way to know (at the time) that the bear was killed in the wrong hunting area. There is no reasonable basis for construing the district attorney's decision to dismiss the remaining charge against Smette as a concession that the bear was killed legally and that none of the participants could lawfully be convicted of a game offense.

For these reasons, we uphold Judge Torrisi's refusal to inform the jury that the district attorney had dismissed the remaining charge against Smette.

*Judge Torrisi's refusal to admit Brigman's video tape that purportedly depicted a hike to the spot where the bear was killed*

At trial, Brigman's attorney attempted to introduce a video tape of the area where the bear was killed. The video tape was recorded by Roy Lesher, Brigman's wife's employee, in October 2000—that is, about five months after the hunt.

■ Brigman argued that the video would have allowed the jury to see how difficult it can be for a person to know their exact position when they are in the field, and how hard it would be for Smette, Lesher, and Brigman to know when they had crossed the boundary from one permit hunt area to another.

The State objected to the video tape because the video was not a continuous recording. The hike to the kill site was approximately ninety minutes, but the video tape ran for only twenty minutes. The State argued that the video was misleading because it would lead the jury to think that it took only a few minutes for the hunters to move into the wrong permit hunt area. The State also objected to the fact that, at several points in the video tape, an individual pointed to locations on a map that had no topographical markings and that had not been admitted into evidence. (Apparently, the purpose of this pointing was to indicate to the viewers of the video where the video photographer was located at that moment.)

Judge Torrisi refused to admit the video tape; he concluded that the video did not fairly represent the route to the kill site because it showed only a portion of that route, and because it was recorded at a different season of the year, when the ground and the foliage would appear different.

■ A video tape is admissible if the proponent of the evidence establishes, as a foundational matter, that the tape "accurately depict[s] the subject and ... will be helpful to the jury".[24] The video need not be totally free from inaccuracies, "as long as there is an explanation of these imperfections so that the jury is not misled."[25] However, a trial judge has discretion under Evidence Rule 403 to exclude potentially relevant evidence if the probative value of the evidence is outweighed by the danger that it may confuse or mislead the jury.[26]

The primary issue litigated at Brigman's trial was whether Brigman knew or should have known that the bear had been killed in the wrong permit hunt area. The State presented testimony that the boundary between the two permit hunt areas was "very easy to distinguish". Brigman, on the other hand, argued that the boundary was unclear.

The video tape showed only selected portions of the hike to the kill site. Given these omissions, the potentially misleading portions pointed out by the prosecutor, and the fact that the tape was made at a different season of the year, we conclude that Judge Torrisi did not abuse his discretion when he declined to allow Brigman to introduce the video tape.

**24.** *Johnson v. State,* 636 P.2d 47, 67 (Alaska 1981).

**25.** *Kaps Transport, Inc. v. Henry,* 572 P.2d 72, 75–76 (Alaska 1977); *see also Beck v. Dept. of Transportation & Public Facilities,* 837 P.2d 105, 113–14 (Alaska 1992) ("[S]ubsequent photographic evidence of reconstructed events is admissible as long as a proper foundation is laid and any discrepancies between the reconstruction and the original event are explained.").

**26.** *See Johnson,* 636 P.2d at 67.

Brigman argues that Judge Torrisi could not properly rule on the admissibility of the video tape until he personally viewed the tape himself. But the parties made the judge aware of the content of the tape, and Brigman did not dispute the major deficiencies that formed the basis of Judge Torrisi's ruling—the fact that the video tape was made some five months after the hunt, and the fact that it did not record the entire distance that the hunters had had to traverse to reach the kill site. Thus, even though Judge Torrisi did not view the tape, he could properly rule on the admissibility of the tape based on the parties' descriptions of its content.[27]

*Judge Torrisi's refusal to allow Brigman to introduce the State's previous charging documents that mistakenly identified the site of the bear kill as Permit Hunt Area 258, rather than Permit Hunt Area 232*

On October 16, 2000, the State filed a complaint against Brigman that charged him with aiding or abetting Smette's illegal act of killing a bear outside the area authorized by Smette's hunting permit. This charge was reiterated in an information dated December 26, 2000 that was intended to supersede the October complaint. Both of these pleadings charged Brigman with aiding or abetting Smette's act of killing a bear in violation of his permit, but both pleadings mistakenly identified the site of the kill as "Permit Hunt Area 258" (the hunting area where Smette was authorized to kill a bear)

instead of "Permit Hunt Area 232" (the true site of the kill). The State remedied this error when it filed a corrected information on January 10, 2001.

At trial, Brigman asked permission to introduce the two earlier charging documents. He asserted that the State's misidentification of the permit hunt area should be deemed an admission that the bear was in fact killed in Permit Hunt Area 258, the hunting area in which Smette was authorized to take a bear. Judge Torrisi refused to admit the pleadings on this basis. He told Brigman's attorney, "We know it was a mistake, and I'm not going to hold the State to it."

On appeal, Brigman renews his argument that the October and December pleadings were admissible as admissions of a party-opponent (*i.e.*, the State) that the bear was killed in the proper hunting area. Alternatively, Brigman argues that the pleadings were admissible as public records tending to show that the proper hunting area was difficult to identify. Brigman contends that, even if the misidentification of the permit hunt area stemmed from clerical error, this would go to the weight of the charging documents, not their admissibility.

Courts often admit superseded or withdrawn pleadings in civil and criminal cases on the theory that they constitute evidentiary admissions. (Of course, the party who filed and then withdrew the prior pleadings is entitled to explain them.)[28] If the

---

**27.** *See United States v. Hearst*, 563 F.2d 1331, 1349 n. 14 (9th Cir.1977) (*concluding that the trial court did not err by excluding a tape recording without listening to it first, since the court was familiar with its content*).

**28.** *See, e.g., First Bank of Marietta v. Hogge*, 161 F.3d 506, 510 (8th Cir.1998) ("[statements in] abandoned ... pleadings ... are admissible evidence that can be weighed like any other admission against interest"); *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir.1996) (holding that the trial court erred in granting a motion for summary judgment because admissions in the defendant's initial answers, which were later amended to deny the allegations, created a genuine issue of material fact); *United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2nd Cir.1991) (holding that court erred in refusing to admit prior inconsistent bill of particulars in criminal case because "the jury is at least entitled to know that the

government at one time believed, and stated, that its proof established something different from what it currently claims"); *United States v. McKeon*, 738 F.2d 26, 30–31 (2nd Cir.1984) ("The law is quite clear that superseded pleadings constitute the admissions of a party-opponent and are admissible in the case in which they were originally filed as well as in any subsequent litigation involving that party."); *State v. Irving*, 114 N.J. 427, 555 A.2d 575, 580 (1989) ("factual assertions in pleadings or in superseded pleadings may be used against the parties who made the assertions"). *See generally* Michael H. Graham, *Federal Practice & Procedure*, Evidence § 7026 (Interim ed.2002), Vol. 30B, p. 19; Ediberto Roman, *"Your Honor, What I Meant to State Was ..."*: *A Comparative Analysis of the Judicial and Evidentiary Admission Doctrines as Applied to Counsel Statements in Pleadings, Open Court, and Memoranda of Law*, 22 Pepperdine Law Rev. 981, 995–98 (1995). *But see Molsber-*

party made the admission in error, or without adequate information, that fact generally goes to the weight of the evidence, not to its admissibility.[29]

But here, as Judge Torrisi noted, the record is clear that the misdesignation of the permit hunt area was a clerical error rather than an admission of fact. It was uncontested that Smette had a valid permit to kill a brown bear in Permit Hunt Area 258. If the kill occurred in that permit hunt area, there would be no charges. The State's case against both Smette and Brigman rested on the assertion that the kill had occurred in the adjacent hunting area, Area 232. Indeed, the State's initial complaint against Brigman correctly charged him with unlawfully possessing or transporting a bear that had been killed in Permit Hunt Area 232. And, at trial, Brigman never disputed that the bear was killed in Area 232.

Given these circumstances, Judge Torrisi could properly conclude that the State's October and December pleadings had essentially no probative force as admissions against interest and that, instead, these pleadings were likely to mislead the jury. The judge's ruling was not an abuse of discretion under Evidence Rule 403.

### Brigman's sentencing arguments

In advance of Brigman's sentencing, various members of the community submitted letters to the district court. Eleven of these letter-writers supported Brigman, but another six letter-writers accused Brigman of committing various other hunting and fishing violations.

Brigman's attorney filed a sentencing memorandum in which the attorney referred to the accusatory letters. The defense attorney stated, "To the extent that these letters allege that Mr. Brigman has acted illegally or improperly in the past, Mr. Brigman intends on entering a testimonial denial in all respects at sentencing."

Despite this announcement, Brigman did not offer a testimonial denial of the alleged past misdeeds at his sentencing hearing. Instead, in an unusual procedure, the prosecutor called Brigman to the stand (without objection from Brigman's attorney). The prosecutor began his examination of Brigman by saying, "Mr. Brigman, I note that you entered a testimonial denial as to any criminal allegations in any letters, and I have a few questions to ask [you] regarding your testimonial denial[.]"

In fact, the prosecutor's premise was wrong. Brigman had not entered a testimonial denial of anything at that point. Brigman's attorney had announced Brigman's *intention* to enter a testimonial denial at sentencing, but Brigman had never made any statement under oath denying the alleged other crimes.

After the prosecutor asked Brigman a few questions about the alleged other crimes, Brigman's attorney objected that the prosecutor's questions were irrelevant and designed merely to harass Brigman:

> *Defense Attorney:* [W]hat is the relevance of this[?] It's clear that what [the prosecutor] is trying to do is set up Mr. Brigman for perjury charges.... It's no secret [that this is] what he's trying to do. I don't see ... the relevance [of the prosecutor's questions]. [Mr. Brigman] can deny [the other crimes], and the matter's ended.

But this is not the law.

Under our prior decisions, a "testimonial denial" for sentencing purposes means that the defendant (1) testifies under oath that the other allegations of misconduct are false, and (2) submits to cross-examination on these issues.[30] If Brigman wished to

gen v. United States, 757 F.2d 1016, 1019 (9th Cir.1985) (holding that a pleading should not be construed as an admission against the truth of an alternative or inconsistent pleading in the same case because that would undermine the federal rule allowing litigants to present alternative and inconsistent pleadings).

**29.** *See Huey,* 82 F.3d at 333 (quoting *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.,* 32

F.2d 195, 198 (2nd Cir.1929)); *United States v. Bakshinian,* 65 F.Supp.2d 1104, 1109 n. 5 (C.D.Cal.1999); *Dreier v. Upjohn Co.,* 196 Conn. 242, 492 A.2d 164, 168 (1985).

**30.** *See Evans v. State,* 23 P.3d 650, 652 (Alaska App.2001); *Hamilton v. State,* 771 P.2d 1358, 1362–63 (Alaska App.1989).

prevent Judge Torrisi from relying on hearsay allegations of other crimes contained in the various letters, Brigman had to deny those allegations under oath *and* submit to cross-examination about them.

Brigman's attorney asserted in a pre-sentencing memorandum that Brigman intended to enter a testimonial denial at sentencing. However, the defense attorney's assertion concerning his client's intention to enter a testimonial denial at a later time did not itself constitute the requisite testimonial denial. To the extent that the record in this case contains Brigman's testimonial denial of anything, that denial is contained in Brigman's answers to the prosecutor's few questions about the other alleged incidents.

During the prosecutor's questioning, Brigman denied that he had left subsistence nets unattended, or that he had pulled other people's crab pots, or that he had shot unwounded ducks while his boat was running, or that he had lied on his assistant guiding license application, or that he had possessed a firearm. (Brigman is a convicted felon.) After hearing Brigman deny these allegations, the prosecutor declined to call witnesses to challenge Brigman's denials; instead, the prosecutor told the court that he accepted Brigman's "clear statements on the issues". But Brigman never addressed several other allegations contained in the letters: allegations that Brigman had set illegal nets and long lines, had snagged fish and then provided those fish to his clients, had guided illegally, had allowed his dogs to run wild and kill deer, and had left trash, caches, and meat in the field.

We need not discuss this point any further because, for an independent reason, we must ask the district court to reconsider Brigman's sentence. When the district court reconsiders the sentence, the parties can straighten out the problem of Brigman's nearly nonexistent testimonial denial.

■ Brigman argues that Judge Torrisi improperly relied on letters containing allegations of other misconduct when Brigman's attorney never received those letters in advance of the sentencing hearing. At sentencing, Brigman's attorney told the court that he did not think he had copies of all the adverse letters sent to the court. In response, Judge Torrisi listed the letters he had received. The defense attorney informed the judge that he did not have one of these letters: the adverse letter written by John Witteveen, owner of the Wild Creek Lodge. This matter was then never resolved; the sentencing continued.

When Judge Torrisi imposed Brigman's sentence, he referred to the accusatory letters twice. First, the judge stated that he was concerned about "[the] community condemnation of [Brigman's] act, which ... is represented by your neighbors out there, but to some extent is refuted by [the testimony] you've provided." A little later, Judge Torrisi continued in the same vein:

> *The Court:* I [will] rely on these four or five letters that say things about you, to [show] that there is a significant [segment] of your community saying that you're doing things illegally. They're asking these officers to come in and enforce the law. And, as I said at the outset, this is a crime that's hard to catch, it's hard to prove ..., and I think I have to emphasize deterrence when I ... sentence you.

From Judge Torrisi's remarks, it is impossible to tell whether he was relying on the letter that Brigman's attorney did not receive in advance of sentencing. For this reason, we remand this case to the district court so that Judge Torrisi can either (1) clarify his remarks or (2) give Brigman a chance to respond to this letter (since Brigman's attorney now knows of the letter and its contents).

### Conclusion

For the reasons explained here, we AFFIRM Brigman's conviction, but we REMAND Brigman's case to the district court for reconsideration of Brigman's sentence.