Erick A. **DAVID**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. A–8698.

Court of Appeals of Alaska.

Nov. 10, 2005.

Michael R. Smith, Thetford Center, Vermont, for the Appellant.

Kenneth J. Diemer, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

At a joint trial, a jury convicted Erick A. David and his co-defendant, William R. Grossman, of second-degree murder[1] for assaulting Larry Brown and causing his death. David claims that the superior court erred by refusing to allow him to present evidence of a factual concession that the prosecutor made in a memorandum opposing one of David's pre-trial motions. David also claims that the court erred by admitting evidence that the police found blood on one of David's shoes that was genetically similar to the blood of another person who was injured at the scene. Finally, David contends that the superior court erred by refusing to give the lesser-included offense instructions that he requested. We reject each of these claims for the reasons expressed below.

---

1. AS 11.41.110(a).

David argues that the 30–year term to serve imposed by the superior court is excessive. Because we conclude that David's sentence is not clearly mistaken, we affirm David's sentence.

### Background facts and proceedings

On August 14, 2001, David, Grossman, Kevin Vanderway, Kathy Tugatuk and Brown were drinking heavily near downtown Anchorage. A dispute arose in the group which ended with Grossman and David punching and kicking Brown extensively. Brown died at the hospital shortly thereafter.

The grand jury indicted David and Grossman for second-degree murder. Grossman was also indicted for third-degree assault for injuring Vanderway.

At David and Grossman's joint trial, the jury convicted David and Grossman of second-degree murder. Superior Court Judge Larry D. Card sentenced David to 50 years' imprisonment with 20 years suspended, a net 30–year term to serve. David appeals.

### Did the superior court properly deny David's request to admit the prosecutor's characterization of the evidence contained in a pre-trial memorandum?

Because of a discovery problem that arose during David's first trial (the State disclosed that Anchorage Police Detective Mark Huelskoetter had shown several witnesses a photo line-up that included David), the court declared a mistrial. Before the re-trial, David moved the court for leave to depose four people about the photo line-up: three witnesses who saw the attack on Brown from their residences and Detective Huelskoetter, who showed the photo line-up to at least two of those witnesses. In the memorandum opposing David's motion to depose the witnesses, the prosecutor asserted: "David was not identified from the photographic line-ups which were shown to two witnesses[.]" Judge Card denied David's request to depose the three civilian witnesses, noting that none of the three had identified David, but granted the deposition of Detective Huelskoetter.

At the re-trial, after David rested the defense case, Judge Card excused the jury to discuss a motion David had filed the day before. This motion asked the court to admit the prosecutor's written assertion, quoted above, that David had not been identified in a photographic line-up. David argued that the prosecutor's statement in the memorandum was admissible under Alaska Evidence Rule 801(d)(2) as the admission of a party opponent. In the memorandum accompanying David's motion, David suggested that the prosecutor's statement be presented to the jury in written form as either (1) a quotation titled "Admission of Plaintiff" and signed by the prosecutor; or (2) as a jury instruction.

Judge Card denied David's request because he felt that the suggested means of presenting the prosecutor's statement to the jury would require the prosecutor effectively to testify. Judge Card did not deny David's request on the ground that evidence of the witnesses' failure to identify David was itself inadmissible. Judge Card stated that David could present the evidence to the jury via the testimony of the detective who conducted the photo lineup.

Judge Card said that he would allow David's attorney to reopen the defense and call Detective Huelskoetter to testify about the photo line-ups. David's attorney reminded Judge Card that Detective Huelskoetter (who had previously testified pursuant to the court's deposition order) could not remember whether the witnesses he had interviewed identified David. The record shows that Detective Huelskoetter testified that one of the witnesses to whom he had shown the photographic line-up had not identified David, but Huelskoetter could not recall whether anyone else to whom he showed the line-up had been able to identify David. In response, Judge Card advised David's attorney to argue to the jury at closing that no witness had been able to identify David: "[T]hat's the best evidence of your argument, isn't it?" Alternatively, Judge Card suggested that the attorneys could stipulate that no witness had identified David. Judge Card concluded that, although the evidence of the prosecutor's statement was relevant, it was more prejudicial than probative because introducing it would essentially require the prosecutor to testify as a witness.

David argues that the superior court abused its discretion by refusing to admit the statement. Statements contained in the pleading of an opposing party can constitute an admission of a party-opponent.[2] McCormick's treatise on the law of evidence notes that, when an attorney makes a formal statement in a brief or an in-court stipulation, that statement constitutes an admission.[3] Courts generally decline, however, to admit statements by a government agent in a criminal prosecution when the statement is made about the investigation of the case.[4] Even so, courts have ruled that formal statements by government attorneys in a criminal prosecution made after the initiation of proceedings are admissions.[5]

But even assuming that Judge Card's ruling may have been error, the state of the evidence at trial reflected the same point the prosecutor made in the memorandum. There was no indication that any of the three civilian witnesses whom David wanted to depose identified David from a photo line-up. Indeed, when each of the three witnesses testified at trial, none of the three witnesses were asked to identify David in the courtroom in any way, whether by his facial features or physical characteristics. One of the three testified on direct examination that she identified David's co-defendant, Grossman, in a photo line-up shown to her by Officer Huelskoetter. This witness also identified Grossman in the courtroom. But neither Grossman's nor David's attorney asked that witness anything about her identification of Grossman or the photo line-up.

David's identity was established by other evidence. For example, the police recovered Brown's coat from David, and David admitted that the coat was Brown's. DNA statistically likely to be Brown's DNA was found on David's shoes. Furthermore, David admitted that he went with Brown and others to the lot where the beating occurred and, when the police contacted David, he admitted that he was still wearing the same clothing that he had worn to the lot. David's clothing looked like the clothing described by witnesses to the beating.

Essentially, the prosecutor's statement in the memorandum that David had not been identified in a photo line-up only summarized the evidence presented at the trial. David's attorney emphasized the absence of a photo lineup both in opening statement and in final argument. We conclude that the absence of the prosecutor's statement had no substantial affect on the jury's verdict. Even if Judge Card did err in declining David's request, we conclude that any error was harmless.[6]

*Evidence of a bloodstain on David's shoe was properly admitted*

David argues that the superior court improperly denied his motion, based on Evidence Rule 404(b), to exclude evidence of a bloodstain that was found on David's shoe. DNA testing showed the blood as statistically likely to be Vanderway's blood (the indictment charged Grossman with third-degree assault on Vanderway). Judge Card ruled that the evidence was relevant as to co-defendant Grossman's case. Judge Card did not rule on whether the evidence was admissible regarding David. He noted that the evidence "may also become relevant as to the State's case, but the State's not offering it in first instance."

Later, when the State called criminalist Kristen Denning to testify regarding the blood stains on David's shoes, David argued that the State could not introduce the evidence. Judge Card concluded that, since David was not accused of assaulting Vanderway, there was no reason to bar the evidence.

2. *See Brigman v. State,* 64 P.3d 152, 166–67 & n. 28 (Alaska App.2003). *But see Hayes v. Xerox Corp.,* 718 P.2d 929, 932 (Alaska 1986) (ruling that an oral statement during closing argument by defense counsel in a civil negligence action— in which counsel conceded specific amounts of special damages—was counsel's opinion only and was not an admission).

3. John W. Strong, et al. *McCormick on Evidence* § 259, at 154–55 (5th ed.1999).

4. *Id.* at 160.

5. *Id.*

6. *See Love v. State,* 457 P.2d 622, 631 (Alaska 1969).

Judge Card suggested that the evidence would not prejudice David because it would show only that David was present when Vanderway was injured, not that he had injured Vanderway. Judge Card therefore overruled David's objection. Later, David proposed a limiting instruction that addressed his view of the evidence.[7] Judge Card declined to give the instruction, ruling that the evidence was relevant because it would (1) explain "the entire atmosphere" of the crime scene; (2) establish the identity of the perpetrators; and (3) show a common plan shared by David and Grossman.

The State also called Dr. Abirami Chidambaram, a DNA analyst at the Alaska crime lab, who testified that the bloodstain on David's shoes was in all probability from Vanderway.

■ On appeal, David argues that the court erred by admitting evidence that the bloodstain on David's shoes was Vanderway's blood. David maintains that the bloodstain evidence was impermissible character evidence showing his propensity for assault admitted in violation of Evidence Rule 404. But the evidence was admitted at trial for non-character purposes not governed by Evidence Rule 404.

The evidence was clearly relevant for the reasons Judge Card expressed. Therefore, Judge Card did not err when he declined David's request to bar the evidence. In addition, for these same reasons, Judge Card did not err when he declined David's request for the jury instruction discussed above.

*David's request for jury instructions on fourth-degree assault*

At the close of evidence, the parties discussed which lesser-included offense jury instructions the jury should receive in addition to the instructions on second-degree murder. The parties agreed that the jury should receive instructions on the lesser-included offenses of manslaughter and criminally negli-

gent homicide. David argued that the court should also instruct the jury on fourth-degree assault. But the prosecutor argued that assault cannot be a lesser-included offense of criminally negligent homicide. She reasoned that, because there is no lesser culpable mental state than criminal negligence, "that's where the lessers stop." Judge Card agreed with the prosecutor.

Judge Card presented David with a choice. The jury would either be instructed on second-degree murder, manslaughter, first-degree assault, and third-degree assault, or, alternatively, the jury would be instructed on second-degree murder, manslaughter, and criminally negligent homicide. David chose the second option. The jury was instructed on manslaughter and criminally negligent homicide as lesser-included offenses of second-degree murder.

On appeal, David argues that the court erred in refusing to instruct the jury on the lesser-included offense of fourth-degree assault because, based on the evidence presented, a jury could not convict him of second-degree murder without also finding that he had used reckless or criminally negligent force against the victim. David also argues that Judge Card violated his constitutional right to a jury determination of factual matters by limiting the number and type of lesser-included offense instructions available to him.

■ Criminal Rule 31(c) notes that a defendant can be convicted of an offense necessarily included in the crime charged. And in *Willett v. State*,[8] we explained when a defendant deserves an instruction on a lesser-included offense:

A lesser offense is necessarily included in the offense charged when it would be impossible, in the context of the case, to convict of the charged offense without also convicting of the lesser. A trial court is required to give a lesser-included offense

7. The instruction read as follows:
Mr. David is not charged with assaulting Mr. Vanderway. If you have found that there was evidence that Mr. David participated in an assault against Mr. Vanderway, this evidence must be disregarded. You shall not consider

any inference of any kind from this evidence and you must not permit yourself to be influenced to any extent, however slight, against Mr. David based on this evidence.

8. 836 P.2d 955 (Alaska App.1992).

instruction when "there is a factual dispute as to an element of the greater offense so that the jury could rationally acquit on the greater offense and convict on the lesser offense."[9]

For a factual dispute to exist, there must be "some evidence" such that a reasonable juror could entertain a reasonable doubt on the element.[10]

In *Ridgely v. State*,[11] we considered a challenge by Ridgely that the superior court had failed properly to instruct the jury on a lesser-included offense of manslaughter.[12] Ridgely argued that, although the trial court had instructed the jury on reckless manslaughter, the manslaughter instruction did not inform the jury that it was possible that manslaughter applied to knowing and intentional homicides.[13] We rejected Ridgely's claim. We concluded that Ridgely had suffered no prejudice because the jury received a proper lesser-included offense instruction on second-degree murder but chose instead to convict on first-degree murder.[14] Since the jury rejected second-degree murder as a lesser-included offense, Ridgely suffered no prejudice, even assuming the manslaughter instruction was inaccurate.[15]

█ Here, David received lesser-included offense instructions on manslaughter and criminally negligent homicide, in addition to the instruction on second-degree murder. David does not challenge the instructions on those lesser offenses as improper. As we concluded in *Ridgely*, we conclude here that David was not prejudiced by Judge Card's decision not to instruct on fourth-degree assault.

*David's request that we overrule Riley v. State*

David urges us to reverse our decision in *Riley v. State*.[16] In *Riley*, we overruled our earlier decision in *Echols v. State*,[17] interpreting Alaska's accomplice liability statute.[18]

In *Echols*, we reversed Echols's first-degree assault conviction based on the defendant's accomplice liability for her spouse's assault of their daughter.[19] The superior court had ruled that, under Alaska's accomplice liability statute, Echols could be convicted for acting recklessly regarding the results of her husband's conduct.[20] But we ruled that, to be liable for the acts of her husband, Echols must have intended that the result of the underlying assault statute occur—even though the underlying assault statute requires proof of only a lesser culpable mental state.[21]

In *Riley*, we ruled that when a defendant solicits, or assists another to engage in conduct, and does so with the intent to promote or facilitate that conduct, the defendant is accountable under the accomplice liability statute for that conduct.[22] And "[i]f that conduct leads to unintended injury or death, the defendant can be convicted of assault or criminal homicide[, respectively,] if the government additionally proves that the defendant acted with the culpable mental state required for the charged crime."[23]

David urges this court to reverse *Riley* because an accomplice can act intending to "facilitate" an offense but still lack sufficient culpability for the underlying crime. David argues that "facilitate" can refer to a wide variety of actions, some of which it would be unfair to punish. David argues that he did

9. *Id.* at 958.

10. *Id.*

11. 739 P.2d 1299 (Alaska App.1987).

12. *Id.* at 1301.

13. *Id.*

14. *Id.*

15. *Id.*

16. 60 P.3d 204 (Alaska App.2002).

17. 818 P.2d 691 (Alaska App.1991).

18. *Riley*, 60 P.3d at 221.

19. *Echols*, 818 P.2d at 691.

20. *Id.* at 693.

21. *Id.* at 695.

22. *Riley,* 60 P.3d at 207.

23. *Id.*

not intend that Brown die; that he was not the principal actor in the homicidal assault on Brown; and that his role was not motivated by the same intent as Grossman's.

■ This court should overrule a prior decision "only when clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent."[24] We are convinced that *Riley* was correctly decided. Thus, we reject David's invitation to overrule *Riley*.

### David's excessive-sentence claim

Judge Card noted the brutality of the beating inflicted by Grossman and David: "I cannot imagine much worse activity in the commission of a murder in the second degree. I do believe that the activity in this case, even though it wasn't charged this way, bordered on murder in the first degree. I just cannot imagine the time it took to beat this man to death." Judge Card found that Brown had been beaten so extensively that he was no longer recognizable.

■ Judge Card found that the primary *Chaney*[25] sentencing criteria that applied to David's sentencing were community condemnation and reaffirmation of societal norms. Judge Card also noted the need to restore or rehabilitate David and the need to deter David from further crime. Judge Card sentenced David to 50 years with 20 years suspended, a net 30–year term to serve.

David argues that his sentence is excessive because his conduct compares favorably with sentences this court has upheld in vehicular homicide cases. David compares his case to *Pusich v. State*.[26] In that case, we upheld a sentence of 25 years with 7 years suspended for a manslaughter and first-degree assault conviction, based on the defendant's drunk driving.[27] David also urges us to compare his case to *Foxglove v. State*,[28] in which we upheld a sentence of 25 years with 7 years suspended, based on Foxglove's convictions of manslaughter and five counts of first-degree assault.[29] In *Foxglove*, the defendant began his New Year's Day celebration by seriously injuring a boy while driving his snowmobile at high speeds under the influence of alcohol.[30] Despite having been warned that he was too intoxicated to drive, one-half hour after injuring the boy, Foxglove intentionally drove his snowmobile at seventy miles per hour into a crowd of people gathered around a bonfire.[31]

But *Foxglove* and *Pusich* involved defendants who were sentenced for reckless manslaughter based on proof that the defendants were operating vehicles while intoxicated. David was convicted of second-degree murder, an unclassified felony punishable by a sentence of 10 to 99 years of imprisonment, for causing Brown's death from an extended beating.[32]

Over twenty years ago, in *Page v. State*,[33] we adopted a benchmark sentencing range of 20 to 30 years to serve for a typical first offender convicted of a typical second-degree murder.[34] David is not a typical first offender. David has fifteen previous convictions, four of which were assaults. And, at sentencing, Judge Card distinguished the conduct that resulted in Brown's death from the typical second-degree murder case: "in this case, the ferociousness of the beating that Mr. Brown received takes it out of what I consider the mainstream, the average, that's described in *Page* of a murder in the second

---

**24.** *State v. Fremgen,* 914 P.2d 1244, 1245 (Alaska 1996) (citations omitted).

**25.** *State v. Chaney,* 477 P.2d 441 (Alaska 1970) (codified in AS 12.55.005).

**26.** 907 P.2d 29 (Alaska App.1995).

**27.** *Id.* at 31–32, 41.

**28.** 929 P.2d 669 (Alaska App.1997).

**29.** *Id.* at 670, 672.

**30.** *Id.* at 670.

**31.** *Id.*

**32.** AS 11.41.110(b); AS 12.55.125(b).

**33.** 657 P.2d 850 (Alaska App.1983).

**34.** *Id.* at 855. *See also Brown v. State,* 4 P.3d 961, 964 (Alaska App.2000); *Sam v. State,* 842 P.2d 596, 603 (Alaska App.1992).

degree." Judge Card noted that Brown's murder was "well beyond that which is outlined in *Page* . . . This was not just a simple assault with a deadly result. . . . [T]his was closer to murder in the first degree." Judge Card noted that, although Grossman was the primary perpetrator, David aided and abetted Grossman. Even though Judge Card found that much distinguished David's offense from a typical second-degree murder case, Judge Card still imposed a term to serve that was at the upper end of the benchmark range.

From our review of the record, we conclude that David's sentence was not clearly mistaken.[35]

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

**35.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (holding that an appellate court must uphold a sentencing decision unless it is "clearly mistaken").